# EXHIBIT A

Filed
D.C. Superior Court
12/12/2017 22:51PM
Clerk of the Court

## SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

|  |  |
|---|---|
| AMOS N. JONES )<br>    1711 Massachusetts AV NW )<br>    Washington, DC  20036 )<br> )<br>                        Plaintiff, )<br> )<br>v. )<br> )<br>CAMPBELL UNIVERSITY )<br>    143 Main Street )<br>    Buies Creek, NC 27506 )<br> )<br>JOHN BRADLEY CREED )<br>    143 Main Street )<br>    Buies Creek, NC 27506 )<br> )<br>J. RICH LEONARD )<br>    2204 Fairview Road )<br>    Raleigh, NC 27608 )<br> )<br>ROBERT COGSWELL )<br>    143 Main Street )<br>    Buies Creek, NC 27506 )<br> )<br>TIMOTHY ZINNECKER )<br>    105 Feathercrest Lane )<br>    Apex, NC  27539 )<br> )<br>SUSAN THROWER )<br>    225 Hillsborough Street )<br>    Raleigh, NC  27603 )<br> )<br>CATHOLIC UNIVERSITY OF )<br>AMERICA )<br>    Office of the General Counsel )<br>    620 Michigan Avenue N.E. )<br>    Washington, D.C. 20064 )<br> )<br>                        Defendants. )<br> ) | Case No: _____<br><br>For Violations of (i) Section 1981; (ii) Title VII; (iii) Breach of Contract;<br>(iv) Defamation; (v) Negligent Supervision;<br>(vi) Fraud/False Pretenses; (vii) Intentional Infliction of Emotional Distress;<br>(viii) Conversion; (ix) Tortious Interference and Invasion of Privacy<br><br><br><br>**<u>Jury Trial Demanded</u>** |

1

**COMPLAINT FOR
MONETARY RELIEF AND JURY DEMAND**
<u>Preliminary Statement</u>

1.      This is a civil action against Campbell University ("Campbell" or the

"University") and Campbell administrators President John Bradley Creed, law-school Dean J.

Rich Leonard, General Counsel Robert Cogswell, Associate Dean Timothy Zinnecker, and law-

school Professor Susan Thrower for monetary damages for injuries Plaintiff Amos N. Jones has

sustained as a result of Defendants' written and spoken defamation causing documented

professional and medical harm in Washington, D.C., as written by Campbell's own insurance

company's doctor on November 1, 2017, discrimination against him on the basis of his race, and

retaliation against him in response to his having filed and pursued federal charges naming

Defendants for their race discrimination and retaliation, in violation of the Civil Rights Act of

1866 as amended, 42 U.S.C. § 1981, and/or the Civil Rights Act of 1964, 42 U.S.C. § 2000.

This is also an action against Campbell University below-named co-defendants for breach of

contract, negligent supervision, common-law fraud/false pretenses, intentional infliction of

emotional distress, and conversion.

2.      As detailed more fully below, Professor Jones is an African-American man who

was a law professor at Campbell's Norman Adrian Wiggins School of Law (the "Law School")

from July 2011 to May 2017 teaching Contracts I, Contracts II, Professional

Responsibility/Ethics, and a legal-history course titled The Black American Lawyer. When

Professor Jones joined the Law School, he was the only full-time African-American law

professor, and he left as the only full-time African-American law professor actively serving on

faculty in 2016-17. His personnel record at Campbell University and all previous employers was

without spot – that is, discipline-free and progress-replete going all the way back to his first job in 1994.

3.     Campbell University's law school has not tenured a black person in more than a decade, though they have hired string of faculty from lesser known law schools with tenure in recent years, 100% of them white, despite the American Bar Association's Fall 2015 critique of the school's lack of blacks following a major re-accreditation site visit.

4.     Campbell University's law school has revised its minimum tenure standards downward to accommodate white professors who were failing to meet minimum standards for publication progress year after year on the six-year tenure track that was implemented as part of the Campbell University Norman Adrian Wiggins School of Law Tenure Policy (the Tenure Policy) weeks after Professor Jones joined the faculty.

5.     Professor Jones joined the faculty in Fall 2011 after having spent one year as Visiting Assistant Professor of Constitutional Law at North Carolina Central University in nearby Durham, three years as an Associate in International Trade and Commercial Litigation at Bryan Cave LLP in Washington, D.C., and one year as a Visiting Scholar at the University of Melbourne Law School in Australia, which he attended on a Fulbright Postgraduate Scholarship after graduating from the Harvard Law School in 2006.

6.     Professor Jones's recommenders for his faculty appointments included the late John Mansfield, Charles Ogletree, Randall Kennedy, and Kenneth Mack – all tenured Harvard Law professors who taught him and, in the cases of Ogletree and Mack, supervised him as their Research Assistant.

7.     Campbell Law School hired Professor Jones following a unanimous vote of the faculty in Fall 2010 after Professor Jones successfully applied to the school and interviewed with

3

or presented to every professor on the full-time faculty. As Assistant Professor of law, he

obtained outstanding course evaluations and superior annual performance reviews every year on

faculty and, having desegregated the law faculty as a black scholar, was named 2012-13 Vice

Chair of the Faculty Recruitment Committee by Interim Dean Keith Faulkner, who now serves

as Dean of Liberty University's law school, in Virginia. Through his agency and unusual tactics

that brought people together in ways never known at Campbell Law School, Campbell hired the

first black female ever hired onto the full-time law faculty in the nearly 40-year history of the

law school.

8.      In 2014-15 at Campbell, Professor Jones applied for and obtained a unanimous

vote of the tenured faculty to be promoted to Associate Professor of Law upon a Fall 2015

endorsement vote by the Campbell University Board of Trustees, made retroactive to the start of

that school year, while Professor Jones was away on an unpaid, one-semester leave serving as

Academic Visitor to the Faculty of Law at the University of Oxford in England.

9.      Other than Professor Lucas Osborn – the only other Harvard Law alumnus on the

full-time faculty – no other professor had, or has since, applied for this intensively-documented,

six-months-long promotion process under the new Tenure Policy; unlike any single other new

hire into Assistant Professor posts at Campbell Law, Professor Jones, as a prolific author and

former journalist for several Pulitzer Prize-winning newspapers, had exceeded the new policy's

minimum publication requirements before joining the Campbell Law faculty. Campbell hired

and hires white candidates for entry-level Assistant Professor posts who had never published a

single law-review article, despite the professed goal of the dean and president to enhance the

scholarly output of the faculty in order to qualify for acceptance as a member institution of the

Association of American Law Schools.

4

10.    During Professor Jones' first four years at the Law School, he met or exceeded all of the other qualifications for tenure, too, while publishing in journals such as the highly prestigious *North Carolina Law Review* and presenting at Harvard, other U.S. institutions, and abroad.  In all of his pre-tenure annual reviews, Professor Jones was retained on faculty with flying colors, satisfying both of the law-school deans that he should apply for tenure in his fifth year – one year earlier than normal – due to his stellar performance. Former Dean Melissa encouraged an early application in successive annual reviews, and her successor Dean J. Rich Leonard did the same. Meanwhile, the school promoted his work via social media, on its Web site, and in promotional videos. Dean Leonard placed him on the admissions committee.

11.    In January 2015, following the previous years' requests of two deans and the text of the tenure policy for early applications, Professor Jones timely applied for tenure before taking unpaid leave to conduct constitutional research for a semester abroad as an invited Academic Visitor to the Faculty of Law at the University of Oxford, in England.  In obtaining permission for and planning this unpaid leave, Professor Jones relied on Dean Leonard's specific, written January 2015 assertions that Professor Jones' semester abroad would not negatively affect his early-tenure application; both Dean Leonard and his predecessor Dean Melissa Essary had actively encouraged Professor Jones to "go up" one year early because he had been so far along by every measure over all of his years on faculty at Campbell, including his unanimous approval by the tenured faculty for Promotion to the rank of Associate Professor in 2015.

12.    Professor Jones filed his early application for tenure in Fall 2015 in exact accordance with the text and precedent under the Tenure Policy – going the extra mile of

5

providing this application, as defined in the Tenure Policy, in formal writings and reports three times over the course of 2015.

13.    However, Dean Leonard and the University later declined to submit his tenure application to the Tenure and Promotion Committee for the review and vote, in plain violation of the Law School's Tenure Policy.  Although Professor Jones had timely applied in January 2015 and reconfirmed his application while on leave in September 2015, Dean Leonard did not forward Professor Jones' application for review by the Tenure and Promotion Committee, falsely claiming that he had not applied until September 28, 2015, 13 days after the application deadline. Meanwhile that month, the tenured faculty – which was and remains racially segregated, excluding blacks – did discuss the application and declined to act on it, according to Associate Professor Kevin Lee, an Asian American who was there and Professor Jones's former mentor. Nobody bothered to tell Professor Jones that the faculty was denying him the avenue of promotion afforded to the two white female Assistant Professors who in 2014-15 had gone up one year early for tenure without ever having applied for promotion to Associate Professor. These two whites – Sarah Ludington and Lisa Lukasik – enjoyed full consideration and were tenured immediately and given the promotion to Associate Professor because the Dean asked for it on their behalf, even though they had not applied for the promotion.

14.    Meanwhile, because none of the actual evaluation actions of a Tenure Panel occur until the spring semester, as Dean Leonard had advised Professor Jones in January 2015 in approving Professor Jones's Spring 2015 request for the leave, Professor Jones spent his Fall semester in England as planned, working for free at the Dean's request on the Admissions Committee, dutifully evaluating applications for admission and telephonically attending

admissions meetings amid a tough budgeting year for law schools like Campbell nationally, even as he lost $60,000 in compensation and benefits over that period.

15.     Only after arriving back in the United States in mid-Spring Semester 2016 did Professor Jones learn that, under Dean Leonard back in September, his application had been tabled by the tenured faculty. In late February 2016, when Professor Jones noticed no contact from the Tenure & Promotion committee, from his faculty mentor, or from his pre-tenure, three-professor panel of senior faculty members who had praised him for three years, he wrote to Professor Lee, the Campbell-designated mentor, to ask what the next steps would be in the tenure process, given his application's timely filing in 2015.

16.     Professor Lee informed Professor Jones by reply e-mail that the Spring voting meeting of the tenured faculty had been held the day before – weeks ahead of the March deadline for that annual meeting called-for under the Tenure Policy – and that his application was dead. Professor Jones immediately confronted Dean Leonard via e-mail about this chain of violations, citing his reliance on Dean Leonard's inducements for him to go on the prestigious Oxford leave on the unpaid autumn rather than in the paid summer.

17.     Dean Leonard noted that he had the discretion to proceed with Professor Jones' allegedly late tenure application, but declined to exercise this discretion supposedly because Professor Jones had taken a semester for the visitorship abroad, working a total about-face despite his repeated written assurances to the contrary, including when Professor Jones had specifically offered in writing to take the visitorship in the summer of 2015 to avoid any possible interference with his early tenure application.

18.     In Fall 2016, Professor Jones again timely applied for tenure, as Dean Leonard confirmed by e-mail on November 10, 2016. As before, Professor Jones exceeded all

7

requirements; moreover, Professor Jones by this time had established an international reputation as both a top-rated civil-rights and religious-liberty scholar and appellate litigator and a political forecaster invited to lecture on four continents – highly uncommon feats that up-and-coming Campbell Law School promoted on its Web site and in its printed materials and among reasons for which Professor Jones had be re-appointed to the Faculty Recruitment Committee in 2016-17.

19.     Dean Leonard, this time, assembled a Tenure Panel – a group of persons different from the previous year and including tenured tax professor Robert Loftis, longtime tenured Professor William Woodruff, who himself had been on a sabbatical the year before, and Associate Professor Lisa Lukasik, the advisor to the Black Law Students Association who had been given her promotion to Associate Professor without filing an application owing to Dean Leonard's intervention at the same time as Professor Jones was promoted to Associate Professor in Fall 2015.

20.     Tenure at Campbell University is not a promotion, according to the policy; elevation to the rank of Associate Professor, however, is a promotion. (Unlike Professor Jones, Professors Lukasik and Sarah Ludington – white female Assistant Professors of Law – were granted promotions to Associate Professor on the special request of Dean Leonard to University officials; these women were not required to apply for promotion. Likewise, Professor Ludington was promoted in Spring 2017 to Associate Dean despite her having been on leave and that position's not being offered for competitive application.)

21.     On January 9, 2017, just weeks before the Tenure and Promotion Committee was scheduled to convene, Associate Dean Timothy Zinnecker – a white male hired with tenure in the 2010-11 hiring round from a low-ranked law school in Texas – told Professor Jones that he

8

and Dean Leonard had conferred and agreed that his teaching performance was "unacceptable" for a tenure candidate based on Professor Jones's most recent student evaluations. This explanation was pretextual: Campbell-favorable ratings of those evaluations showed that approximately four-fifths of those Fall 2016 student evaluations were entirely, 100-percent positively rated – and that a number of them had come from a required Ethics course whose enrollment had swelled from 30 to 80 because Professor Jones's teaching had grown so legendary; meanwhile, some of the more-negative evaluations explicitly made disparaging statements about Professor Jones's race. Two of the evaluations expressly warned dean-suite readers in writing that there was a small, student-led conspiracy afoot to defame Professor Jones's performance over anger that he, without endorsing any political candidates, had nevertheless developed a famous model that accurately predicted the U.S. presidential-election outcome down to particular states (e.g., Michigan) and then provided stunning real-time analysis on live, statewide television hours after the victory speech of President-elect Donald J. Trump.

22.    In November, the day following the election, one of Professor Jones's Professional Responsibility/Ethics students wrote and delivered an anonymous memorandum to Dean Zinnecker warning the administration that a wave of post-election angst had swept across the classroom and that students had behaved so inappropriately in Professor Jones's class that she feared that Campbell could risk losing a top professor because of the shameful misconduct of her classmates. Dean Zinnecker left the letter on Professor Jones's desk with instructions to handle the matter as appropriate. Professor Jones did so during the following week's class, and in a firm but forgiving way that garnered the instant applause of his students.

23.    Campbell Law School's enrollment has been approximately 3% black for all of Professor Jones's years there; nevertheless, Professor Jones's teaching was so effective that in

Spring 2014, 70 white students, eight of other races, and one community auditor who would join

the law school's Board of Visitors as its only black enrolled in his 9:30 a.m. Thursday elective,

The Black American Lawyer, a history course he had initiated at historically black North

Carolina Central. This popularity took hold in a school that allows students to take only a

handful of electives over their three years because the emphasis on maintaining an unparalleled

Bar-passage success rate calls for innumerable required subject-matter courses to prepare

students specifically for the North Carolina Bar Examination. This popularity took hold, as well,

because of Professor Jones's unique ability to bridge liberal and conservative, black and white,

and all communities and perspectives in between.

    24.    Because of his record of excellences and inclusivity in School but also in his 7-0

reversal victory in a landmark racial-discrimination/breach of contract Kentucky Supreme Court

case brought by a wrongfully terminated black tenured professor in Kentucky in 2014, Campbell

students in 2013-14 voted him as recipient of the Faculty Award for Pro Bono Service.

Meanwhile, he represented the law faculty and others by delivering a reading on the investiture

service of the new University President J. Bradley Creed in 2016, and he was asked to appear in

an unscripted film featuring his approach to teaching Contracts, leading to the promotional video

airing today at https://www.youtube.com/watch?v=bfVCMN61qNg.

    25.    Professor Jones remained entirely loyal to Campbell University, a school to which

he had applied because, like him, they were Baptist in heritage and unapologetically practical in

their educative aims. Professor Jones hails from one of the oldest, most sacrificial, and most

effective civil-rights families in American history, black Baptists from Kentucky who made

marks globally in the fight for constitutional fulfillment during the 1930s, 1940s, 1950s, and

1960s across the eastern United States as educators, pastors, attorneys, and homemakers. His late

uncle the Rev. Dr. William Augustus Jones, Jr., had received an honorary doctorate from

Campbell University and was specifically quoted by former University President Jerry Wallace

in Wallace's 2012 Commencement address during the 125th anniversary year of Campbell

University. Professor Jones's first cousin Alston Meade, Jr., now a Philadelphia lawyer,

graduated from Campbell College in the 1970s, having earned a soccer scholarship to play there.

26.     Yet, in January 2017, Professor Jones was summoned into the office of Zinnecker

just days after burying another deceased uncle after Christmas 2016 (for which Zinnecker had e-

mailed condolences) and hours before the first classes of the Spring 2017 semester. Upon

receiving the oral determination by Associate Dean Zinnecker that his performance was now

suddenly and inexplicably "unacceptable for tenure" (Professor Jones had read the evaluations

and knew the truth), Professor Jones challenged this second attempt to abort his in-process tenure

application. This time, the continuing effort to obstruct his application by this academic official

who had been involved in the previous year's scheme to deprive Professor Jones of his due was

less covert but more abrupt.

27.     At Campbell University, all whites and no blacks are granted tenure, regardless of

the many white professors' habitual failures to satisfy Tenure Policy progress requirements

during successive annual performance reviews. Underperforming, struggling white professors

identified in a damning Chart of Comparators on file at the U.S. Equal Employment Opportunity

Commission were and are given extra years to meet the minimum performance obligations.

Some of them remain on faculty with raised salaries to this day.

28.     On January 10, 2017, Professor Jones, aware that he was being held to a higher

standard than white colleagues who had been granted tenure or who should have been up for

tenure that year, including a number of underperforming professors, filed a charge of

11

discrimination with the U.S. Equal Employment Opportunity Commission alleging that he had been subjected to disparate treatment based on his race. That day, Professor Jones notified Defendants Zinnecker and Leonard that he had filed the EEOC charge by providing scanned copies of the date-stamped EEOC complaint, which Professor Jones had filed in person, and noticing a litigation hold to forestall Campbell's destruction of evidence.

29.     In response to Professor Jones' EEOC charge, Defendants began a prolonged retaliation campaign against Professor Jones. Dean Leonard immediately sent a letter barring Professor Jones from communicating with him – a bizarre move that itself constituted a constructive discharge, given Leonard's obligation to supervise and work with Professor Jones during weekly meetings of the Admission Committee on which Professor Jones served and which Leonard attended and dominated and given his role as presider over the tenured faculty processing Professor Jones's application filed the previous semester.

30.     The Tenure Panel of three white professors, in turn, refused to counsel, advise, and/or otherwise inform Professor Jones of the disposition of the report they owed him by February 1, 2017, concerning the status of his application and what to do to enhance it ahead of the tenured-faculty vote long scheduled for March 13, 2017, under the Tenure Policy – flagrantly violating their duties set out in the Tenure Policy. When confronted over their breach in a written request for the meeting from Professor Jones, Professor Lukasik responded on behalf of all three of them in some detail and eventually, after limited back-and-forth with Professor Jones, assisted in directing Professor Jones to the University's contract-appeals process, but she also shut down his request for the processing of his application under the Tenure Policy and referred Professor Jones for further details to Dean Leonard, who had barred Professor Jones from

12

communicating with him because Professor Jones had engaged in federally protected activity and who, by that time, was ignoring Professor Jones.

31.     Meanwhile, General Counsel Robert Cogswell was in touch with Professor Jones, from mid-January through mid-February, as Professor Jones sought to have his discrimination complaint internally addressed and resolved.

32.     Cogswell throughout this process refused to agree to grant Professor Jones tenure and refused to speak with Professor Jones by telephone, despite Professor Lukasik's having recommended during the week of January 9 that Professor Jones telephone Cogswell in January, convinced that there had been some misunderstanding over the plight of Professor Jones's tenure application.

33.     Cogswell attempted in January to settle the case by having Professor Jones depart Campbell University's faculty on February 14, 2017, in exchange for one year of compensation; Professor Jones rejected this position *pro se* and through counsel, repeatedly and in writing noting that not only was his record spotless, but that (a) leaving in February without tenure would make it appear as though Professor Jones had done something wrong, when in fact Campbell University was entirely and relentlessly in the wrong here and (b) paying for one year of salary was already an entitlement of Professor Jones's because, regardless of any action or inaction on his pending tenure application, he was entitled under the Tenure Policy to a terminal year of employment in 2017-18. Finally, Professor Jones noted, because of his reliance on Campbell's obligation to process his tenure applications filed in 2015 and in 2016, he had not applied for other positions and had no employment to go to on such short notice in the first quarter of 2017. Cogswell never disputed these contractual obligations on the part of Campbell.

13

34.    Professor Jones continued to complain about race discrimination to Dean Leonard and Associate Dean Zinnecker, including filing a written request on February 20, 2017, asking the University to investigate the racist student evaluations in January 2017.

35.    On February 21, 2017, Dean Leonard and Campbell retaliated against Professor Jones by sending Professor Jones a letter stating that he had failed to apply for tenure, that his tenure application would not be reviewed or voted upon by the Tenure and Promotion Committee, that Professor Jones would not be offered a seventh year of employment as provided for by the terms of Professor Jones' employment agreement, and that Professor Jones' employment with Campbell would terminate automatically on May 14, 2017, at the conclusion of the current contract year.  In this letter, he specifically made reference to statements in Professor Jones' EEOC charge as bases for this deviation from the up-or-out Tenure Policy.

36.    As Professor Jones noted in his second EEOC complaint (February 27, 2017), alleging retaliation on the part of Cogswell, the correspondence showing Cogswell's retaliatory acts is not excluded under Federal Rule of Evidence 408:

> [T]his punishment for my having filed discrimination complaints followed a written attempt by the General Counsel of the University, Robert Cogswell, to coerce me into resigning my faculty appointment effective February 14, 2017, pressure that I refused because I have a perfect record. This correspondence with Cogswell is entirely admissible under Title VII to establish my claims of retaliation. *E.g.*, *Carney v. American Univ.*, 151 F.3d 1090, 1095 (D.C.Cir. 1998) (holding that correspondence that was part of settlement negotiations "can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)"); *Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1294 (6th Cir. 1997) (holding that threats of retaliation that occurred during settlement negotiations are admissible when "the evidence serves to prove liability either for making, or later acting upon, the threats"); *Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675, 681 (D. Ariz.1993) (same); *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 0736, 2004 WL 1899927 (N.D.Ill. Aug. 23, 2004) (holding that Rule 408 "does not appear to cover compromises and compromise offers that do not involve the dispute that is the subject of the suit") (quoting *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1363 (10th Cir. 1987)); *Carr v. Health Ins. Plan of Greater N.Y., Inc.*, No. 99 Civ. 3706(NRB), 2001 WL 563722, at *4 (S.D.N.Y. May 24, 2001) (holding statements from settlement negotiations admissible "because they are being introduced not to prove liability for claims being settled, but for an entirely separate claim of retaliation").

Professor Jones went on in his Retaliation charge:

As the EEOC official guidance warns: "Participating in a complaint process is protected from retaliation under all circumstances. Other acts to oppose discrimination are protected as long as the employee was acting on a reasonable belief that something in the workplace may violate EEO laws, even if he or she did not use legal terminology to describe it." And yet, Campbell Law professors and deans, going all the way back to November 16, 2016, have failed to act on complaints of race discrimination/hostile work environment in the workplace. *See* Exhibit 6 (my having intervened to protect a female minority student racially harassed in the Campbell Law School Library)."

37.     As Professor Jones continued to complain about race discrimination and retaliation, including to his mentor Susan Thrower (who in November 2017, in commending his presentation to faculty the day after the Election before heading to headline a lecture at Lake Superior State University in Michigan, wrote to Professor Jones inviting him to come to her with any concerns at all over tenure and promotion), Defendants escalated their targeting of Professor Jones. In an egregious act of retaliation, President Creed and Dean Leonard in early March 2017 each sent separate e-mail messages to all Law School staff, faculty, and students—a group of at least 7,000 people—specifically referencing and denying Professor Jones' complaints of race discrimination and retaliation, in one of them claiming "we are disappointed" in Professor Jones for having complained. This took place while the U.S. Equal Employment Opportunity Commission was investigating the charges and appears to have intimated witnesses.

38.     One black progressive student came to Professor Jones's office to complain about Professor Lukasik's cornering the student to question this student about the believability of Professor Jones's claims.

39.     One white conservative student complained to Professor Jones that Assistant Professor Allegra Collins had used her class time to talk about Professor Jones's charges and stated that "Campbell will take care of it." This professor – a Campbell Law alumna who failed the requirement to address in writing Campbell's Christian distinctive when she applied for her job three years ago but who got hired anyway – is now running for the North Carolina Court of Appeals to join her husband as a state-court judge.

15

40.     Meanwhile, still seeking to learn what the status of his application was, Professor Jones repeatedly inquired of his Campbell-designated Tenure Policy Mentor, Professor Susan Thrower, as to what the actions of the faculty had been in the review and voting to have taken place on March 13, 2017. Professor Thrower, who is white, did not respond to his March 14 written inquiry but eventually referred him via e-mal to the dean for answers. After Professor Jones informed her via e-mail that the Dean had barred communications early on, Thrower did not respond.

41.     Despite her earlier invitation, Thrower refused to engage in her Tenure Policy duties of advising, counseling, and/or advocating for Professor Jones among the tenured faculty. Nor did she adhere to her obligation to investigate the civil-rights complaint Professor Jones specifically addressed to her, when he on March 22, 2017, wrote in detail to her that he feared that their colleagues were engaging in violations of the federal civil rights conspiracy statute, which he quoted straight from the Web site of the U.S. Department of Justice.

42.     In his May 25, 2017, rebuttal to Campbell University's Position Statement, Professor Jones noted: "The EEOC must take note of Respondent's misuse of Susan Thrower – a white woman whom it in Fall 2016 assigned to Mentor Professor Jones even though the two had never met and even though she herself had never been subject to the Tenure Policy because she was brand-new to Campbell and had nothing intellectually or professional in common with Professor Jones at all beyond being on Campbell's payroll. Thrower on March 22 was plainly informed of her black-male Mentee's fear that 'our colleagues' might be engaging in violations of the civil-rights conspiracy statute in continuing to refuse to supply Professor Jones with the process due under the tenure policy. Jones's was a serious complaint on the part of a nationally known civil-rights expert and real-time victim of institutional misfeasance, properly made amid eight sustained weeks of non-information and non-answers to this 'Mentor' in light of

(1) her formal supervisory role under the Tenure Policy required in her contract to Campbell, (2) Dean Leonard's recorded January 11 refusal to allow Jones to communicate with him, and (3) University President Creed's bias followed by his having ignored a three-page March 10, 2017, letter to him from Jones complaining about and requesting that Creed retract his improper and hostile March 2 e-mail blast and quoting both the Civil Rights Act of 1964 and recent Supreme Court opinions of Justices Scalia and Alito showing Campbell's conduct even as of that date as being illegally retaliatory.

"Suddenly, Campbell counsel [Thomas] Farr intervened and claimed that he represented Thrower and every other person at Campbell other than Professor Jones in this huge discrimination case."

43.     Campbell's outside counsel at the time, Thomas Farr of Ogletree Deakins, had received national attention amid the Fourth Circuit's rebuke of his arguments that were found to violate the voting rights act of black North Carolinians enshrined in the Voting Rights Act of 1965.

44.     Only on March 23, 2017, did Professor Jones receive an answer about the status of his tenure application. It came from his previous mentor, tenured Associate Professor Kevin Lee, who informed Professor Jones that his name had not been raised at all in the meeting but that Professors Olivia Weeks and Johnny Chriscoe, who are white and who had experienced documented difficulty meeting the Tenure Policy's minimum publication standards over the years, were being advanced toward tenure. Professor Jones is far better qualified than either for tenure under the Tenure Policy adopted by Campbell University in Fall 2011 that contractually governs the five- to six-year process for law professors' expected advancement.

45.     This disparate treatment effected by the Blacks-excluding tenured faculty followed two public condemnations of Professor Jones for his having filed EEOC charges that were issued in writing to thousands of community members by both University President J. Bradley Creed and Dean J. Rich Leonard.

46.     After learning that Campbell faculty and deans had again failed to submit Professor Jones's tenure application to the Tenure and Promotion Committee for a review and

vote on March 13, 2017, Professor Jones followed the recourse procedures set forth in Dean Leonard's February 21, 2017, Contract Letter by filing a formal written appeal of "contractual issues" to the Appeals Committee of the University's Deans' Council tasked with processing appellate hearings.

47.     In his well-crafted and heavily exhibited March 28 internal appeal addressed to Wakefield as Chair of the Deans' Council, Professor Jones set out quite plainly the University's errors and its obligation to correct its mistakes as per the faculty handbook and applicable law. The gravity of what the University faced evidently sent Campbell officials into a frenzied spiral. Details of the letter are set forth in the Factual Allegations section of this Complaint, *infra*.

48.     Upon receipt of Professor Jones' March 28, 2017, internal appeal documenting the violations and irregularities on the part of the overtly biased President, deans, Tenure Panel, and Mentor, Campbell began to fabricate claims alleging Professor Jones had engaged in misconduct less than seven days earlier.  (Divinity School Dean Andrew Wakefield dismissed the appeal without a hearing within hours of receiving it, falsely claiming that he lacked jurisdiction as to all matters because, he falsely and irrelevantly claimed, Professor Jones had not applied for tenure (one of the very factual issues in the appeal, as Professor Jones informed him in a response challenging that denial of processes under Professor Jones's contract with Campbell).

49.     Defendants twice in a 48-hour period falsely accused Professor Jones of violating the University's Workplace Violence Policy (1) by complaining to Professor Thrower about the civil-rights violations of their colleagues over e-mail and (2) by driving closely past a white colleague in the school's  garage on his way to teach a class on March 23, 2017.

18

50.     Leonard e-mailed the first of these two back-to-back letters to Professor Jones on

March 29, while Professor Jones was on travel to present as an invited panel at a law review

symposium at Washington & Lee University in Virginia the next day. Leonard claimed that

Jones's having complained of discrimination to Thrower constituted grounds for immediate

dismissal from Campbell University as a violent threat – a stunning violation also mailed to

Professor Jones's Raleigh home that proves that Campbell University does not follow Title VII

in that it dismisses employees who bring civil rights charges against others to their university-

assigned mentors and that the penalty for filing such civil-rights charges is immediate dismissal.

51.     Cogswell sent the second letter only hours later, issuing one of the most bizarre

charges imaginable. He falsely accused Professor Jones of recklessly driving toward Susan

Thrower days earlier – a charge apparently disproved by the presence of videotape operated by

Professor Jones on Campbell's own system showing Professor Jones teaching Contracts II

upstairs at the time that she and a second white woman alleged in affidavits sworn out to the

EEOC weeks later. Though irrelevant to the two charges of discrimination made and implicating

both Cogswell and Thrower for their role in the retaliation, these false charges were the defense

in which Campbell anchored its defense at the EEOC – even though the purported events took

place many weeks after Campbell committed egregiously illegal violations against Professor

Jones and had made clear they wanted to force him to leave the University even though his

personnel record was perfect. Campbell to date has never contacted Professor Jones about the

purported allegations despite having been invited to do so; EEOC investigator Kofi Sam and

EEOC Senior Investigator Alvan Robinson declined to turn over an affidavit Thrower swore out,

leaving Plaintiff without precise details of her allegation; however, according to what Cogswell

wrote on March 31, 2017, in issuing the desperate and irrelevant allegation concocted as

Professor Jones's contractual-issues appeal was materializing, Professor Jones was being filmed on tape upstairs teaching Contracts II during the purported parking episode in which she – while herself a known, at-fault person of interest in the federal investigation – falsely accused Professor Jones.

52.     Meanwhile, when negotiating to resolve the case in February and March while Professor Jones continued to teach while seeing to his growing need for medical care with his four physicians and specialists in Washington, D.C., Farr – the outside counsel – had falsely alleged two facts that were incorrect and attempted to impugn Professor Jones's integrity: that Professor Jones had lined up a job and had planned to leave Campbell anyway and that Professor Jones had experienced personnel demerits in previous jobs. Both charges were false, and so Professor Jones, in good faith and still believing that Campbell Law School sought to correct the harm it had twice inflicted on the fault-free Professor Jones, tendered an affidavit indicating that he had no job prospects and, further, had neither sought nor interviewed for any jobs at all since answering an overture of interest from the College of William & Mary's law school before he ventured to Oxford in Fall 2015 and that he had a spotless personnel record of no misconduct alleged or noted in any of his 21 years of employment in life.

53.     Cogswell and Leonard would soon use this information to disadvantage Professor Jones, however.

54.     Meanwhile, on February 20, 2017 – facing silence as to the status of his tenure application and aware of the two unanimously affirming faculty votes he had received along wit the ultimate power of the trustees to tenure him in the upcoming October 2017 meeting, and fully aware of the actuality of his terminal-year employment coming in 2017-18, Professor Jones sought new employment, though at a most inopportune time (mid-semester in the Spring, after

most faculty jobs had been filled, but ahead of the annual cycle for 2018-19 hiring that would

occur at the Association of American Law Schools' annual Faculty Recruitment Conference in

Washington, D.C., in November 2017): He e-mailed formal letters of interest with curriculum

vitae to deans and recruitment faculty on a number of law faculties, including Washington's

Howard University and the Catholic University of America, the latter of which had interviewed

Professor Jones for a visiting professorship in Constitutional Law in Fall 2009.

55.     In the letter, Leonard issued a strange claim used to deprive Professor Jones of the

terminal year entitlement granted in the Tenure Policy: that Professor Jones had never applied for

tenure. The claim that Professor Jones had never applied for tenure was a claim Campbell Law

School never made in any of the correspondence leading to this bombshell abrogation of

Professor Jones's rights -- not even in the General Counsel's January and February 2017

correspondence with Professor Jones's counsel.

56.     The false claim that there was no tenure application came six weeks after

Campbell had been placed under federal investigation by the EEOC for denying Professor

Jones's tenure application for the second time in sixteen months. It immediately reconfirmed

Cogswell's still unexplained request for Professor Jones to depart the faculty on Valentine's Day,

a request that Professor Jones cited in his February 27 retaliation charge at the EEOC that

Leonard and Cogswell issued because Professor Jones (1) was black, and Campbell intentionally

maintains a racially segregated tenured faculty and (2) Professor Jones had engaged in federally

protected activity of reporting Campbell's illegal employment discrimination to the EEOC.

57.     Over the next six weeks, Professor Jones dutifully taught his students but also was

forced to attend to medical challenges; he had received a perfect bill of health prior to entering

the United Kingdom amid the physicals and vaccinations required of the Fall 2015 visit. A fit 39

21

years old with no known medical conditions other than an orthopedic ailment that had remitted

years earlier, Professor Jones took a downward spiral in his health over Spring 2017 as Campbell

University unrelentingly carried out its efforts to rid the faculty of a "rock star," to quote

Leonard's written praise of Jones in June 2016.

58.     Campbell officials had received the written, sworn record of Professor Jones's

spotless employment record and amid his airtight contractual-issues appeal that Leonard himself

had invited in his February 21 letter depriving Professor Jones out of his terminal year of

employment to which his contract entitled him. In the February 21 letter denying tenure (in

violation of the Tenure Policy, which reserved that right to the tenured faculty in their March 13

vote), and citing the EEOC complaint in this abrogation, Leonard overstepped his authority.

59.     Also around that time, Campbell, upon information and belief, interfered with

Professor Jones's approach to the Washington, D.C., law schools. Campbell was seen falsely

alleging that Professor Jones had been untruthful about the status of his employment in its EEOC

Position Statement, which, while failing to defend Campbell's overtly disparate treatment of

black applicants for tenure-track professor positions and black professors seeking tenure,

attached the February 20, 2017, letter that Professor Jones had written to Catholic University of

America in his private e-mail account off campus. To its EEOC Position Statement, Campbell

attached a letter between Professor Jones and Catholic University of America Dean Daniel

Attridge that Campbell's counsel erroneously claimed contained falsehoods that Professor Jones

had issued while seeking information about upcoming employment opportunities there.

60.     Professor Jones's letter to Catholic University of America's law-school dean was

completely accurate, and it was particularly diplomatic in expressing his precarious and up-in-

the-air pre-tenure status without casting Campbell in the negative light it deserved; by contrast,

Campbell University defamed Professor Jones to Catholic University of America, and damaged his reputation before that school that had overtured and interviewed Professor Jones for a faculty position in Fall 2009, long before he had developed into a Super Lawyers-rated constitutional litigator of distinction. If anything, Professor Jones would have been more appealing to Catholic today than in 2009, but as a result of Campbell's willful defamation, Professor Jones's prospects there are diminished.

61.    Likewise, Howard University School of Law appears to have been influenced negatively by Campbell University's engagement with Dean Danielle Holley-Walker and/or her senior staff in charge of hiring. Despite presiding over a law school that numerous legal scholars have called a natural home for Professor Jones's scholarly interests and black heritage, she to date has ignored three application letters and other written approaches by Professor Jones, even despite the June 2017 interventions of a high-profile trustee with considerable global influence to affirm the third of the following overtures Professor Jones made to Howard University School of Law in 2017:

1.  Professor Jones's 4/30/17 Application for the Visiting Professor position, sent to and acknowledged by Professor Josephine Ross after Dean Holley-Walker had issued a pubic call for applications;

2.  Professor Jones's 4/5/17 Application to build and lead Howard University Civil Rights Center as Director and Endowed Professor, sent to Harold McDougall and Danielle Holley-Walker via e-mail as instructed in Howard's public call for applications (never acknowledged to date, though this position was eventually filled with an excellent thought leader); and

23

3. Professor Jones's Friday 6/9/17, FedExed-from-Florida, voluntary overture to teach, as an Adjunct Professor of Law, *pro bono*, his "The Black American Lawyer" history course at Howard Law, to which a syllabus was attached showing Dean Holley-Walker that Professor Jones assigned an *ABA Journal* article that Holley herself had commended to her audience just the week before. In that audience of mostly black Harvard Law alumni practicing in Washington, convened at Bank of America's penthouse near the White House, Professor Jones had informally met Holley-Walker by chance during the reception following a private presentation by Professor David Wilkins, who was unveiling a longitudinal study that revealed, among other things, how unfairly black women appear to be treated in law-firm jobs across America. Professor Jones devotes three weeks to the history, contributions, and challenges among black female lawyers and judges since the early 1900s, including new treatment of Pauli Murray, a Durham native, Howard Law graduate, and early transgender figure, whose biographers include Jones's one-time faculty recommender, Mack.

62. Given that Campbell University officials were meanwhile in active communication with the administration of Howard University School of Law on a personnel matter well into November 2017 – and in light of Campbell's having obtained job-application correspondence between Professor Jones and the Catholic University of America law dean for its peculiar placement into the EEOC investigative file from a D.C. source other than Amos Jones directly – an objective observer is left to conclude that Campbell officials' defamation of Professor Jones precluded his even being acknowledged by Holley-Walker, a black woman who, like Professor Jones, was a 2000s

24

graduate of Harvard Law School with similar professional priorities and educational philosophies and thus, under normal circumstances, would have responded to his offer to teach one course for free (at night, if requested), especially after the endorsement of the powerful Washington figure who supported this approach of Professor Jones's well aware of the problems Campbell had caused – problems that, by then, had been the subject of not fewer than two national news articles, prominent blog coverage in California, and a Quote of the Day on *Above the Law*.

63.     Meanwhile, Dean Keith Faulkner of Liberty University in Virginia – with whom Professor Jones had scheduled an appointment to talk about the tenure-application tabling in Spring 2016 – by Spring 2017 ignored Professor Jones's approach. Faulkner, as Interim Dean at Campbell in 2012-13, had thought enough of Professor Jones's abilities and judgment after Jones's first year there to designate him Vice Chair of the Faculty Recruitment Committee during that year, only Professor Jones's second on faculty. Negativity from Campbell in Spring 2017 apparently caused that prospective replacement employment to evaporate, as well.

64.     Thus, the late February misconduct initiated by Campbell to destroy Professor Jones's prospects at gaining suitable replacement employment was carried out through both Leonard and Cogswell, who by the last two days in March were acting maliciously to corrupt Professor Jones's files with a series of false allegations and threats to dismiss him immediately – totally out of the blue and without ever obtaining so much as a single statement from him or his eyewitnesses. By that time, they were mired in the February 27, 2017, retaliation charge against Campbell that Professor Jones had filed at the EEOC

over the denial of the terminal year in retaliation for his having filed the January 10

discrimination charge.

65.     Not only were Leonard's, Cogswell's, and Thrower's late-March accusations of

misconduct false and totally unfounded, but they furthered Campbell's discrimination by

invoking and animating racist stereotypes of the violent African-American man. Given

the fact that Professor Jones has never been in a physical altercation in his life and has an

excellent driving record, this conduct is all the more outrageous.

66.     Meanwhile, Campbell deans knew that Professor Jones was under the care of an

internist and under the observation of an ophthalmologist, as he had had his eyes dilated

two weeks in a row as he underwent tests, in addition to other job-related trauma dating

from January into May, according to the records of the D.C. physician, a D.C.

dermatologist, a D.C. orthopedic surgeon, and a D.C. ophthalmologist.

67.     Further, at no time then or since has Cogswell accepted Professor Jones's

attorney's immediate invitation of Campbell to interview Professor Jones to refute Thrower's lie,

perhaps because Cogswell is aware of the videotape evidence; Professor Jones levied a litigation

hold on January 10 and started recording every class at that point.

68.     Moreover, Cogswell personally had no business initiating an investigation of

Professor Jones caused by his derelict mentor while he himself was under EEOC investigation

following Professor Jones's February 27 retaliation charge naming him as a principal perpetrator;

the mentor was obviously seeking to cover her own performance deficiencies and legal peril by

jumping on the administration's biased bandwagon publicized by the e-mail blasts of Creed and

Leonard.

69.     Through these actions, Campbell plunged Professor Jones into a documented medical collapse that caused him to be placed on an immediate eight-week no-work order within hours of the false charge levied by Cogswell on behalf of the already-known-to-be-guilty Thrower.  The March 31, 2017, notice from the Board-Certified Internal Medicine physician was grim. After having observed and diagnosed Professor Jones, who had been under physician care for severe medical problems that arose over his semester at Campbell, the physician wrote "recommending that Mr. Jones immediately take recovery measures, including referral to orthopedics, continued anti-anxiety prescriptions, and eight weeks off duty."

70.     Meanwhile, Campbell's statements to the EEOC gave rise to a third charge of pay discrimination, including in the form of ex-professors who were white and underperforming, and retirees, being invited back as paid adjunct professors – opportunities Campbell refuses to extend to Professor Jones to this day, as Campbell has at every turn since January refused to tenure Professor Jones and instead sought to have him leave early because he had reported Campbell's employment discrimination to federal authorities. White pre-tenure Campbell professors over time are paid more than black professors, as they are kept indefinitely without being required to file applications for advancement even as their credentials lists stagnate rather than grow.

71.     By October, Campbell's own insurance carrier in writing blamed Campbell's workplace for Professor Jones's medical problems. Disability-insurance giant Sun Life Medical's Consultant Dr. Margaret O'Connor reviewed the medical records on or about Oct. 2, 2017, after having reviewed Professor Jones's disability caused by Campbell's intentional inflictions of distress and other breaches; writing for her on October 19, 2017, Lee S. Watkins of Sun Life Financial's Appeals Unit, concluded his long report to Professor Jones five months in the making that "it appears as though your anxiety condition was entirely work related." He

27

suggested – after having reviewed months of notes from the four physicians and specialists – that

Professor Jones was entitled to workers' compensation for what Creed, Leonard, Cogswell,

Thrower, and Campbell University corporately had caused.

## Jurisdiction and Venue

72.    This Court has original jurisdiction over Plaintiff's claims for violation of 42

U.S.C. § 1981 under 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000, as these claims arise under the laws of the United States.

73.    This Court has supplemental jurisdiction over Plaintiff's breach of false pretenses,

breach of contract, negligent supervision, common-law fraud, intentional infliction of emotional

distress, and conversion under 28 U.S.C. § 1367, as they form part of the same case or

controversy as Plaintiff's claims for violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000.

74.    Venue is proper as the controversy involves conduct that primarily occurred, and

damages-proving evidence that arose and grows almost entirely, in Washington, D.C., and the

key witnesses (e,g,, Dean and Knights of Columbus Professor of Law Daniel Attridge of

Catholic University of America and Dean Danielle Holley-Walker of Howard University School

of Law) reside and maintain principal places of business (e.g., the American Association of

University of Professors and the Association of American Law Schools), and/or practice

medicine (e.g., all four of Plaintiff's physicians and medical specialists and their records) within

Washington, D.C.

## Parties

75.    Plaintiff Amos N. Jones is a citizen of the District of Columbia who resides at

1711 Massachusetts Avenue NW, Washington, D.C. 20036. Professor Jones received his B.A.

*cum laude* in political Science from Emory University, where he was a National Merit Scholar, a

Truman Scholar, a Robert W. Woodruff Scholar, and the Recipient of Emory College's 2000 Shear Family Prize "for the student most likely to make a uniquely positive impact on her or his universe." Rated globally as a top-20 college student in America by *USA Today* in 2000, Professor Jones went on to earn a Master of Science in 2003 from Columbia University Graduate School of Journalism. Professor Jones earned his Juris Doctor from Harvard Law School in 2006, where he served as an Executive Editor of both the *Harvard BlackLetter Law Journal* and the *Harvard Human Rights Journal* and served as Research Assistant to Professors Lani Guinier, Charles Ogletree, and Kenneth Mack. Following law school graduation, Professor Jones spent a year as a Fulbright Postgraduate Scholar at the Centre for Comparative Constitutional Studies at Australia's University of Melbourne, for which he had been nominated by the late Harvard Law Professor John H. Mansfield, a faculty member of more than 50 years there. Afterward, Professor Jones spent three years as an international trade associate in Bryan Cave LLP's Washington, D.C., office before entering legal academia. Professor Jones served as a Visiting Assistant Professor of Constitutional Law at North Carolina Central University School of Law for one year before joining Campbell. He has amassed an impressive record of publications and lecturing engagements and distinguished himself as a scholar in the areas of civil rights law, race discrimination, racial profiling, foreign-lobbying registration, and other hot-button issues involving political issues in the United States and abroad.

76.     He also has distinguished himself as an unusually moderating, unifying, and healing voice, having been described as "a bridge" by the president professor following the faculty workshop he delivered in 2012 at Georgetown University Law Center in Washington, D.C., and having attracted seventy (70) white students and eight (8) others into his 9:30 a.m.

29

Spring 2014 elective course at Campbell on the History of the Black American Lawyer, which became the most-popular elective in a school with a student body only 3% African American.

77.     Professor Jones routinely overloaded enrollment in that class as well as Professional Responsibility/Ethics to meet the unusually high student demand for his teaching style at Campbell. Over his six years at Campbell, he was asked to write innumerable reference letters for students of all political persuasions, races, and sexes, and he also recruited and hired research assistants and teaching scholars from the range of perspectives and demographics encompassed at Campbell.

78.     At all times relevant to this Complaint, Professor Jones was employed by Defendant Campbell University as an Assistant or Associate Professor of Law at the Norman Adrian Wiggins School of Law in Raleigh, North Carolina.

79.     Defendant Campbell University is a private university organized under the laws of North Carolina, with its central office located at 143 Main Street, Buies Creek, NC 27506. At all times relevant to this Complaint, Campbell had a contractual employment relationship with Professor Jones.

80.     Defendant John Bradley Creed is a citizen of the state of North Carolina and the President and CEO of Campbell University in Buies Creek, North Carolina.

81.     Defendant J. Rich Leonard is a citizen of the state of North Carolina who resides at 2204 Fairview Road, Raleigh, NC 27608. At all times relevant to this Complaint, Defendant Leonard was the Dean of the Norman Adrian Wiggins School of Law in Raleigh, North Carolina.

82.     Defendant Robert Cogswell is a citizen of the state of North Carolina with a mailing address at P.O. Box 236, Buies Creek, NC 27506. At all times relevant to this

30

Complaint, Defendant Creed was the President of Campbell University in Buies Creek, North Carolina.

83.     Defendant Timothy Zinnecker is a citizen of the state of North Carolina who resides at 105 Feathercrest Lane, Apex, NC 27539. At all times relevant to this Complaint, Defendant Zinnecker was the Associate Dean of the Norman Adrian Wiggins School of Law in Raleigh, North Carolina.

84.     Defendant Susan Thrower is a citizen of the state of North Carolina with a principal office address at 225 Hillsborough Street, Raleigh, NC 27603. At all times relevant to this Complaint, Defendant Thrower was Professor at the Norman Adrian Wiggins School of Law in Raleigh, North Carolina.

85.     Defendant Catholic University of America is an institution of higher learning located in the District of Columbia.

**Factual Allegations**

**Terms of Professor Jones' Employment at Campbell**

86.     Plaintiff Jones is an ordained Deacon in the American Baptist Churches. His family has historical ties to Campbell. He spent 2010-11 as Visiting Assistant Professor of Constitutional Law at North Carolina Central University, residing in Durham and Cary. For those reasons, in Fall 2010, Plaintiff Jones contacted Campbell Law School's Faculty Recruitment Committee to express his interest in becoming a member of the law school faculty. Hired by unanimous vote of the full-time faculty as Assistant Professor of Law, Professor Jones from July 1, 2011 to October 2015 was employed as an Assistant Professor of Law at Campbell. In October 2015, in recognition of his outstanding performance and superior qualifications, Professor Jones was promoted to Associate Professor of Law following a unanimous tenured-

31

faculty vote for the promotion and a subsequent confirmation vote by the University's Board of Trustees. Professor Jones served as an Associate Professor of Law at Campbell until his sixth annual contract expired on May 14, 2017.

87.     The terms of Professor Jones' employment with Campbell were governed by an annual employment contract, a faculty handbook, and the Law School Tenure Policy.

88.     Per the terms of Professor Jones' employment, Professor Jones had six academic years as a law professor in which to apply for and attain tenure. If Campbell denied Professor Jones' tenure application in his sixth academic year, he would be entitled to a seventh, terminal year of employment as a law professor, according to that Tenure Policy.

89.     The Law School Tenure Policy provides for four areas of evaluation relevant to a law professor's tenure application: teaching effectiveness; scholarship and scholarly publication; range and effectiveness of service; and support of the University's mission.

90.     The Law School Tenure Policy specifically provides that approved leaves of absence will not disqualify a law professor from applying for tenure or have any effect on the requirements for tenure and in no case will delay the required annual progress.

91.     In a law professor's third academic year, the Law School conducts a pre-tenure panel review of the law professor. The law professor is required to materials to a Dean-selected, three-professor review panel that are substantially identical to the material required for the review of a tenure application. This so-called "binder" includes materials such as the professor's curriculum vitae, teaching materials, course evaluations from students, publications, and other supporting material. After reviewing the applicant's file, the review panel is required to tender a Tenure Panel Review Report, which assesses the professor's progress toward meeting the requirements for tenure.

92.     According to the Law School Tenure Policy, a law professor may apply for promotion to Associate Professor after completing three academic years if he has met the qualifications for that promotion.  The candidate's tender of another binder of the same kinds of materials required in the third year is required for consideration for promotion to Associate Professor.

93.     According to the Law School Tenure Policy, a law professor may apply for tenure after completing four academic years if he has met the qualifications for tenure, though earning tenure is not defined as a promotion at Campbell University.

94.     In order to apply for tenure, the professor must submit an "application" for tenure to the Dean of the Law School on or before September 15.  Although the Law School Tenure Policy does not define "application," the Law School's historical practice requires a law professor to submit an "application" for tenure by providing the Dean with written notice of the professor's intent to apply for tenure.  After receiving the candidate's application for tenure, the Dean shall provide the tenure candidate with written notice by December 15 that the candidate's tenure application will be reviewed the following January.  The notice shall request the candidate to update the binder of materials provided as part of the third year pre-tenure panel review, with such updated materials due to the Law School tenure panel by January 15.  The Law School tenure panel is then required to meet with the candidate by February 1, and submit a Final Panel Tenure Recommendation Report to the candidate and all Law School tenured faculty by March 1.  The Law School tenured faculty then votes on whether to recommend the candidate for tenure by March 21.  Pursuant to this policy, if the candidate is not recommended for tenure, the Law School must notify the candidate by March 31 that the candidate will have a final, terminal year at the Law School before his employment is terminated.  For 2016-17, the Annual Meeting of the

33

Tenured Faculty was scheduled for March 13 and noticed to the faculty as such, in writing by Dean Leonard, several months in advance.

95.     If the candidate is recommended for tenure, the recommendation of the Law School must be forwarded to University Provost and other University administrators for review by March 31, and the University must make a final recommendation to the University's Board of Trustees on the candidate's tenure application by July 31, following a one-on-one interview with the candidate and the University Provost in Buies Creek. The Board of Trustees then votes on the candidate's tenure application during the following fall semester, usually in October.

96.     The Law School regularly grants extensions on the deadlines contained in the Law School Tenure Policy or waives requirements contained in the Law School Tenure Policy in order to accommodate candidates. For instance, the Law School faculty has offered extensions of or extended deadlines for several white law professors, such as Professor Dan Tilly, Professor Olivia Weeks, and Professor Amy Flanary-Smith, administrative professors who had not satisfied the publication requirements in accordance with the deadlines contained in the Fall 2011 version of the Law School Tenure Policy. In addition, on March 6, 2016, Dean Leonard had written an e-mail response to Professor Jones acknowledging that Dean Leonard had the "discretion" to allow a candidate to apply for tenure multiple months after the tenure application deadline contained in the Law School Tenure Policy had passed. Moreover, 2016-17 Tenure & Promotion Committee Chair Professor William Woodruff, who sits on Professor Jones's 2016-17 Tenure Panel and is concluding 25 years on faculty and retiring this semester, wrote in March 2016 that the entire process can be squeezed into three weeks when circumstances warrant doing so.

34

97.     The Law School Tenure and Promotion Committee or tenured faculty had never

voted not to recommend tenure for any internal candidate applicant since the current Law School

Tenure Policy became effective in Fall 2011, days after Professor Jones joined the faculty.

### History of Race at the Law School

98.     Campbell opened the Law School in 1976.  In its 41-year history, the Law School

has hired only three tenure-track African-American professors, only one of which is currently

serving, after having spent 2016-17 on an unpaid leave of absence away from North Carolina.

Now in her fifth year on faculty, she remains at the rank of Assistant Professor of Law.

99.     In recent years, African-American student enrollment at the Law School has

totaled approximately three percent, which is far lower than the percentage of African-American

people residing in the Raleigh area and attending the other six law schools in the state.

Historically Black North Carolina Central University Law School, which is less than 30 miles

away from Campbell's Law School and where Professor Jones served as Visiting Assistant

Professor of Constitutional Law in 2010-11, has a far higher rate of African-American student

enrollment.

100.    The first tenured African-American law professor, Anthony Baker, abruptly left

the Law School in or around 2010 after defending an African-American law student who had

been treated unfairly. Other than a founder of the law school who left to help establish Elon

University School of Law in Greensboro several years ago, Professor Baker appears to be the

only professor who has ever felt the need to make a lateral move from Campbell Law School

onto another law faculty.

101.    Baker remains the only Black person ever tenured by Campbell Law School, but

he faced the unprecedented requirement in his tenure process of having to be approved by the

University's Board of Trustees for tenure to be effective – a hurdle that white colleagues up for

tenure had never had to endure. That was the first time such a requirement was superimposed,

though it is now standard under the 2011 Tenure Policy. Campbell University changes the

application of its policies to make advancement harder for superior black professors.

102.    The Law School has a history of granting beneficial treatment to underqualified

white law professors.  For instance, in the 2012-2013 academic year, Professor Jones vice-

chaired the Faculty Recruitment Committee.  The Committee had six candidates for three open

professor positions, and two of these candidates were African-American women.  The

Committee reviewed each candidate's credentials and voted on whether the candidate was

"qualified."  Three candidates were deemed qualified by a two-thirds majority vote of the full

Law School faculty, including one of the African-American women.  By Committee rules, the

three qualified candidates were to be offered the professor positions.  However, by motion of a

white faculty member, one of the unqualified white candidates, Jennifer Pacella, was voted on

again, deemed "qualified," and offered the job instead of the African-American candidate.

Tuneen Chisolm, the African-American candidate, held multiple graduate degrees from elite

universities including two Ivy League institutions, had a prestigious and highly successful career

in legal practice, and had some teaching experience at a law school more selective than

Campbell, plus five patents, in addition to writing thoughtfully about Campbell's distinctive

mission.  Despite being more qualified than at least two of the three white candidates, the Law

School did not offer her a professor position until one of the three white candidates declined the

Law School's offer.

103.    In the 2016-17 academic year, despite Professor Jones's informed advocacy (as a

member of the Faculty Recruitment Committee) for hiring a black female applicant offering

36

sterling credentials away from her law faculty in another sate, another pair of marginally qualified white-male professors were offered the jobs.

104.    Students of color have submitted many complaints about racial harassment and discrimination, but the Law School has failed to respond to their complaints in any reasonable fashion or to take any type of corrective measures.

105.    African-American students have repeatedly filed complaints about the Raleigh Police giving racially insensitive safety instructions during annual orientation that make African-American students feel marginalized, but the Law School has not intervened on their behalf.  The Raleigh Police has told first-year law students, the vast majority of whom are white, that they should not let into the Law School building in downtown Raleigh "anybody who doesn't look like you."

106.    In the 2013-14 academic year, the Black Law Students Association (BLSA) was denied funding for its annual Black History Program by a Campbell administrator and alumna. Professor Jones, though not the advisor to the BLSA, intervened by fully funding the BLSA request so that a history program could be presented. Campbell's BLSA keeps a white advisor as its student members openly acknowledge that any white professor carries more weight in a school where blacks are not tenured.

107.    In 2013-14, Dean Leonard's first year as Dean, Professor Jones was tapped to chair the Law School Community, Diversity and Student Life Committee. Much of the Committee time that year was absorbed by a faction of white-male students and professors who used the committee to push for the official recognition of a gay-affirming law students' association, Lambda. Campbell University's official policies reflected the still-existent positions of the historically leading Baptist denominations on this point, including even the most-liberal

37

American Baptist Churches in the U.S.A. Campbell University policy very specifically barred the recognition of any organization promoting or affirming homosexuality. The Lambda group was advised by a white, non-tenure track professor who had clerked for Clarence Thomas but who now serves in the administration of the Democratic North Carolina governor. Two of the three voting members on the committee did not vote for recognition of the group – including one Assistant Professor who is now on voluntary leave from Campbell working in President Trump's administration at the Department of Justice – but it was recognized anyway, violating university policy. Professor Jones promptly resigned from the leadership of this diversity committee, citing that vote as an "act of disaffiliation" from the North Carolina Baptist fold similar to a move at Mercer University that cost it $1 million per year in support from, and its permanent formal affiliation with, the Georgia Baptist Convention. Dean Leonard appointed as Professor Jones's replacement a white-male, non-tenure track instructor and alumnus of Campbell Law School to head the diversity committee.

108.    Despite these occasional controversies, Professor Jones managed to maintain extremely positive relationships with each and every one of his faculty colleagues and his deans at every turn at Campbell, which explains his unanimous support from them, his prominent placement in manifold promotional materials published by Campbell, as well as a series of personal notes like the one Professor Tilly wrote encouraging Professor Jones to make every effort to stay on faculty that Professor Tilly hand delivered to Professor Jones's office in January after word spread among the faculty that Professor Jones was to be denied tenure per the January 9-communicated conclusions by Zinnecker and Leonard.

109.    Also, though sincerely devoted to the school's Christian-values distinctive, Professor Jones supported its all-comers approach to admissions and, when policies were

38

changed by the University administration after 2012-13, hiring. For example, in 2014, he

successfully recommended a female Muslim trial lawyer from Chicago whom Tilly, a Texas

Baptist, eventually hired as an adjunct professor into the trial advocacy program.

110.   In the 2015-2016 academic year, the American Bar Association ("ABA")

conducted an accreditation review of the Law School. The ABA specifically noted the Law

School's dearth of black law professors as being of serious concern, according to Dean

Leonard's review of the visit in his presentation to an early Fall 2016 faculty meeting.

111.   On March 31, 2017, Professor Jones filed a complaint with the ABA's

Accreditation Committee, following the process for challenging a racially segregated law

faculty. The ABA responded committing itself to taking no action to compel Campbell into

compliance with the principles it had articulated to Campbell in Fall 2015 when it specifically

had taken note of the law school's dearth of black faculty.

### Professor Jones' First Tenure Application

112.   During Professor Jones' first three academic years at the Law School, he excelled

in his role as a law professor and member of the University community. He exceeded the

publication requirements contained in the Law School Tenure Policy, received outstanding

reviews from students and faculty, and served as a community leader. As a result of Professor

Jones' efforts, including his coordination with then-Assistant Professor Lisa Lukasik, the Law

School successfully recruited a second African-American law professor, the first woman of color

ever on Campbell Law's tenure track.

113.   In the 2013-2014 academic year, Professor Jones successfully completed the

third-year pre-tenure panel review process as required by the Law School Tenure Policy. As part

39

of this process, Professor Jones submitted the required binder of teaching materials. The panel report contained no negative feedback whatsoever about Professor Jones.

114.    Over the next semesters, Professor Jones continued to submit periodic updates to his binder of materials, including on September 26, 2014, October 2, 2014, November 15, 2014, February 3, 2015, April 23, 2015, October 13, 2015, May 12, 2016, October 1, 2016, and October 23, 2016.

115.    Professor Jones applied for a promotion from Assistant Professor of Law to Associate Professor of Law in his fourth academic year. As part of this application process, on September 26, 2014, Professor Jones submitted an update to the binder of materials he had submitted as part of his third year pre-tenure panel review. In its 2015 annual meeting of the tenured faculty, the tenured faculty unanimously voted to promote Professor Jones to Associate Professor. Dean Leonard and the University Provost confirmed the vote, following Professor Jones' July 2015 interview with the Provost, Mark Hammond. In October 2015, while Professor Jones was on leave at Oxford, the University Board of Trustees approved the promotion and made it retroactive to August 2015.

116.    Earlier that year, Professor Jones entertained a preliminary overture from the faculty of the highly regarded law school at The College of William & Mary, in Virginia, an approach made by its chair of the Faculty Appointments Committee that concluded in August, as Professor Jones set sail for his visitorship in England.

117.    In January 2015, Professor Jones had accepted the opportunity to conduct an unpaid but prestigious academic research experience abroad at the University of Oxford during the fall 2015 semester. Professor Jones immediately contacted Dean Leonard, expressing his interest in pursuing the Oxford opportunity. However, Professor Jones made clear that he was

applying early for tenure in the 2015-2016 academic year, telling Dean Leonard in a series of memoranda that he would forgo the Oxford opportunity if going in the fall would negatively impact his ability to gain tenure in any way. By e-mail dated January 19, 2015, Dean Leonard encouraged Professor Jones to pursue the Oxford opportunity, and assured him that conducting research at Oxford would not "delay your tenure application, and in fact, I think it would strengthen your résumé." Professor Jones immediately replied, stating that he would be taking unpaid leave to study at Oxford in reliance on Dean Leonard's assurances that it would not affect Professor Jones' tenure application and stipulating that if there were any doubt that being gone might imperil his chances, then he would move and abbreviate the Oxford visit to summer 2015.

118.    Relying on Dean Leonard's assurances, Professor Jones took leave during the fall 2015 semester to study at Oxford. Prior to his leave, Professor Jones submitted multiple notices in writing to Dean Leonard of his desire to pursue tenure in the 2015-2016 academic year, per the Dean's own encouragement in Professor Jones's annual reviews with the Dean and his predecessor. On September 28, 2015, Professor Jones sent Dean Leonard a letter reiterating his request for tenure. On October 13, 2015, Professor Jones sent an updated progress report to the Tenure and Promotion Committee, thus updating his binder of materials. At this point, Professor Jones had completed all necessary tasks for the Tenure and Promotion Committee to review and decide upon his tenure application. Indeed, the Tenured Faculty itself, since 2010-11, has voted to hire, with tenure, not fewer than three professors without such materials and firsthand knowledge of candidates. All of the Professors hired with tenure (Timothy Zinnecker, Scott Pryor, and Susan Thrower) are white.

119.    Meanwhile, Professor Jones, per his Dean's special request, worked for Campbell without any compensation all that semester, continuing his service on the Admissions Committee

remotely by reading approximately 150 applications for admission and dialing in for some of its weekly meetings. He also returned to the Raleigh campus to deliver to a monthly Faculty Meeting the final report of the dean's *ad hoc* Law Review Evaluation Committee he had chaired during the previous year.

120.    Through the end of 2015, Professor Jones received no communications about the status of his tenure application but did not worry as Dean Leonard had written that January that nothing really happened in the way of faculty action on the applications until the spring semester anyway. In February 2016, after returning to Campbell for the spring 2016 semester and aware that the Tenure Policy called for the annual meeting of the tenured faculty, where tenure votes were made, to take place by the end of March, Professor Jones asked his designated Mentor, Associate Professor Kevin Lee, about the status of his tenure application. In response, Professor Lee informed him that Dean Leonard had not submitted his application to the Tenure and Promotion Committee in the fall 2015 or early 2016.

121.    On March 6, 2016, Dean Leonard wrote Professor Jones purportedly to explain what had happened. Dean Leonard first claimed that Professor Jones did not apply for tenure until September 28, 2015, even though Professor Jones had sent a letter reiterating his January 2015 request for tenure, and even though previous, white professor-applicants had tendered their notices in very informal e-mail messages far less explicit than Professor Jones' formal filings. Given that the deadline for applying for tenure was September 15, 2015, Dean Leonard claimed that Professor Jones' application was late. However, in the same e-mail Dean Leonard recognized that he had the "discretion" to invite Professor Jones to proceed with his tenure application despite allegedly missing the September 15 deadline. Dean Leonard claimed that he had decided not to exercise his discretion in this fashion because the tenured faculty indicated

42

that Professor Jones' leave of absence in Oxford negatively impacted his tenure application. In closing, Dean Leonard stated that "I will do everything I can" to assure Professor Jones would receive tenure in the 2016-2017 academic year.

122.    On March 7, 2016, Professor Jones replied to Dean Leonard, thanking him for his explanation but expressing frustration. Professor Jones noted that he had complied with all of the requirements contained in the Law School Tenure Policy, and that his application was thus not late or insufficient. Professor Jones further protested that he had gone on an unpaid research leave to Oxford only because Dean Leonard assured him that this leave would not impact his tenure application. Professor Jones noted that Dean Leonard's decision to postpone his tenure application because of his leave of absence violated the Law School Tenure Policy.

123.    On March 7, 2016, Professor Jones raised his concerns about the treatment of his tenure application with tenured law professor William Woodruff. In a long response e-mail encouraging Professor Jones to remain faithful to Campbell, Professor Woodruff declared that the University had made "a royal screw up" in handling Professor Jones' tenure application. Professor Woodruff described how the Law School is usually very relaxed about its tenure policies, and that there was no good explanation for why Professor Jones' application was not reviewed and voted on. Professor Woodruff assured Professor Jones that the Law School's failure was due "to incompetence rather than ill will," and that Professor Jones might want to "game this out" with him in a sincere effort to get the application before the Board of Trustees in time for a vote in Fall 2016. Otherwise, Woodruff implied, Professor Jones should trust the University to consider his application for tenure in the 2016-2017 academic year.

124.    Professor Jones also sought input at that time about what he should do from Professor Essary, a full professor and Dean Leonard's immediate predecessor as Dean of the

Law School.  Professor Essary is a stateswoman of the law school who had supported Professor

Jones' admission to the Bar of the Supreme Court of the United States, along with former

Interim Dean Keith Faulkner. She was present in Fall 2015 when the faculty passed over

Professor Jones and declined to inform him of their refusal to advance his application.

125.   On March 2, 2016, she wrote: "I'm not sure what happened, but it's clear that at

this point the application hasn't moved through the normal processes. I do think, as you noted

below, that your sabbatical probably played a role in that. My advice: apply next year. You are

uniformly loved, admired, and valued by all. I don't anticipate even a hint of anything other than

a smooth process next year."

126.   Although Professor Jones suspected he was targeted for unfair treatment due to

his race, he relied on the assurances of Professor Woodruff and Dean Leonard and the advice of

Professor Essary to set aside the University's breach of Professor Jones' employment contract

and to wait for his tenure application to be reviewed in the 2016-2017 academic year, which they

assured him would lead to a positive determination.

### Professor Jones' Second Tenure Application

127.   On November 10, 2016, Dean Leonard wrote an e-mail message to Professor

Jones and three tenured law professors to constitute Professor Jones' Tenure Panel,

acknowledging Professor Jones' tender of his September 2016 timely formal application notice.

This e-mail certified that Professor Jones had applied for tenure, and that Professor Jones had

until January 15, 2017, to make any updates to his binder of materials.

128.   The Tenure Policy contained special instructions for Professors like Professor

Jones, who had applied in the fifth year and were applying again in the sixth year. Professor

Jones is the first and only person on faculty who was forced to apply twice and to whom these

provisions applied, but Professor Jones dutifully adhered to the Tenure Policy as applicable in his circumstance.

129.    The notice from Dean Leonard appointing Professors Woodruff, Lukasik, and Robert Loftis to the tenure panel and copied to Associate Dean Zinnecker made clear that Professor Jones had timely applied for tenure, stating in full:

Friends:

This is my notification under the Tenure Policy that the three of you constitute the Tenure Panel for the review of Professor Amos Jones' application for tenure. Please read the policy carefully to make sure you are familiar with your obligations. In summary, the panel elects its chair, and conducts the review in January and February, meeting with the candidate by February 1 as specified in our policy. Your Final Panel Tenure Recommendation Report must be submitted to the candidate and the tenured faculty by March 1. The attention of the applicant is called to the description of the material that must be submitted to the Panel no later than January 15.

Dean Leonard

130.    On January 9, 2017, Professor Jones returned to the Law School after winter break on an evening where he was due to attend dinner with a finalist for a faculty appointment job. Before interviewing the candidate, he was suprised to find a very short January 2, 2017, memo on his desk in his office from Associate Dean Zinnecker attached to several envelopes of evaluations claiming that the student evaluations for Professor Jones' fall 2016 Contracts and Professional Responsibility courses were "mixed/disappointing" and directing Professor Jones to visit with Associate Dean Zinnecker.

131.    Later that afternoon, a snow day with a calm quiet in the law building, between the interview and the dinner with the candidate, Professor Jones met with Associate Dean Zinnecker to discuss the evaluations. Associate Dean Zinnecker had provided Professor Jones with copies of the evaluations attached to the memorandum, which Professor Jones had reviewed.

132.   Having conducted a cursory review of the evaluations, Professor Jones opened

cordially and provided a defense of his work and his teaching, noting that a number of the

student evaluations were inaccurate and noting the sour political mood from the semester.

133.   Associate Dean Zinnecker then responded that both he and Dean Leonard

considered the evaluations "unacceptable" for a professor applying for tenure, voluntarily

introducing that career milestone into the conversation, warning Professor Jones that his teaching

quality was suddenly "unacceptable," and thereby indicating that Professor Jones would not be

granted tenure.

134.   Associate Dean Zinnecker told Professor Jones that both he and Dean Leonard

had discussed them and concluded that these evaluations were some of the worst evaluations any

professor had received that fall with the exception of one adjunct professor of the approximately

fifty adjunct professors, who are not typically professional teachers.

135.   Professor Jones voiced disappointment that, despite six years of outstanding,

unblemished performance and a considerable percentage of those most-recent evaluations

entirely preeminent in the written praise for his teaching, his tenure prospects were now shot.

Aware of Zinnecker's presence in the Fall 2015 meeting in which he was unfairly passed over,

Professor Jones noted, "I might as well leave" and returned to his office to prepare for the diner

with the job candidate.

136.   After reviewing more closely the Campbell student evaluations in his office, still

on the afternoon of January 9, 2017, Professor Jones wrote an e-mail message to both Dean

Leonard and Associate Dean Zinnecker protesting the characterization of the evaluations as

"unacceptable" for a candidate for tenure and summarizing the representations Associate Dean

Zinnecker had made about Dean Leonard's conclusions about Professor Jones' lack of qualifications to be granted tenure.

137.    Shortly thereafter, Professor Jones had a brief conversation with Associate Dean Zinnecker, who had come to Professor Jones's office upon receiving the e-mail. During this visit, Professor Jones pointed out that the evaluations were not much different from Professor Jones' in previous years, with regard to range, and reiterating, as he had before leaving Associate Dean Zinnecker's office moments earlier, that it was unbelievable that a handful of evaluations given in one semester marked by racial hostilities and tensions nationwide could negate five and one-half years of exemplary job performance, on the eve of tenure votes. Associate Dean Zinnecker stated that he had not intended for Professor Jones to leave the University. Zinnecker then proposed that Professor Jones meet with both him and Dean Leonard in person to discuss the situation. Professor Jones agreed.

138.    After leaving the meeting with Associate Dean Zinnecker and overnight, Professor Jones conducted a thorough review of every single student evaluation from the previous semester. The vast majority of the evaluations (nearly four fifths) were entirely positive, and indeed many of them were superlatively preeminent. Some of them lauded Professor Jones for being a challenging professor requiring students to think critically, especially in ethics class. Fewer than one-fifth of the reviews contained more than two negative responses about Professor Jones out of approximately eight questions. Furthermore, at least three reviews made disparaging remarks about Professor Jones' race. One evaluation criticized his affiliation with a black church, and two others degradingly referred to Professor Jones as the "smartest black man" or "wisest black man" the students had ever encountered.

139.    Almost all of Professor Jones's students at Campbell University Norman Adrian Wiggins School of Law are white Millennials. It is well established that African-American professors face unique challenges from Millennials in those students' assessments of teaching. The best survey research has established the fact that Millennials generally have more negative views of blacks than other age groups in America, with almost a third of white Millennials indicating in survey research that black people are lazier and less intelligent than white people.

140.    As reported in the WASHINGTON POST on June 23, 2015: "Two studies of Millennials – the generation just ahead of the high school students – included some disturbing findings about whites. A 2014 General Social Survey showed that more than 3 out of 10 whites born between 1980 and the early 2000s believe that blacks are lazy and less intelligent than whites." Likewise, the Center for Excellence in Teaching and Learning at Kennesaw State University in Georgia published a report on August 3, 2017, citing widespread findings that "several studies document bias in student evaluations. For instance, Hamermesh and Parker (2005) found that non-white and female faculty receive lower evaluations (up to half a standard deviation lower) than their white male peers. In a study of online courses, women posing as men increased their evaluations and men posing as women received lower scores than usual (MacNell et al. 2015), leading to scholars' conclusions that "[t]his double bind is unfortunately far from unique and it is consistent with several research findings, all converging on the idea that faculty of color and other minorities, and particularly women, are often penalized by students on end-of-semester evaluations."

141.    Yet, despite this uphill battle, four-fifths of Professor Jones's white Millennial students and others in the toughest of political climates (the Election of 2016 in the battleground of North Carolina) lauded Professor Jones's teaching effectiveness. Professor Jones concluded

that the Campbell administration was unfairly scapegoating his students and their evaluations in order to establish a pretext for additional employment discrimination to keep its tenured faculty free of blacks.

142.    On January 10, 2017, Professor Jones submitted a charge to the U.S. Equal Employment Opportunity Commission ("EEOC") complaining that Campbell University, Associate Dean Zinnecker, and Dean Leonard had twice intentionally derailed Professor Jones' tenure applications because of his race.  In the EEOC charge, Professor Jones described how Campbell has a long history of advantaging white professors and students over minorities, and how several unqualified white professors had been granted promotions or extensions despite failing to meet the requirements contained in the Law School Tenure Policy.  That day, Professor Jones wrote an e-mail message to Dean Leonard and Associate Dean Zinnecker informing them that he had filed the EEOC charge and attaching a date-stamped photocopy noting the need for an instant Litigation Hold of a scope specified by Professor Jones.

143.    On January 11, 2017, Dean Leonard wrote Professor Jones, informing him that a meeting that had been scheduled for that day to discuss Professor Jones' student evaluations was now cancelled, and that Professor Jones should refrain from contacting Dean Leonard except through the University's attorneys.  Dean Leonard, ignoring the fact that both he and Associate Dean Zinnecker declared Professor Jones' performance "unacceptable" for a candidate for tenure, instructed Professor Jones to proceed with the tenure application process as if everything were normal.  Dean Leonard further advised Professor Jones that any updates to his binder of materials were due on January 15.

144.    Dean Leonard was Professor Jones' supervisor.  His refusal to communicate with Professor Jones negatively impacted Professor Jones' ability to perform his job or to proceed with his tenure application.

145.    Confused by Dean Leonard's mixed messages, on January 11, 2017, Professor Jones wrote to the three members of his Tenure Panel, described Associate Dean Zinnecker's comments about Professor Jones' student evaluations, disclosed Professor Jones' filing of the EEOC charge, and informed them of Dean Leonard's untenable response.  Professor Jones noted that Dean Leonard has a substantial role in the tenure process, and stated he believed it might be futile to submit his updated binder of materials by January 15, 2017, if Dean Leonard was determined to frustrate an otherwise-anticipated faculty recommendation for tenure anyway.

146.    Professor Jones remembered how the tenured faculty of Fall 2015 – which did not include Professors Lukasik and Woodruff – had derailed his application and delayed his advancement, deceiving him into a false sense that they were treating him as well as they had treated white applicants for tenure.

147.    Over the next few days, Professor Jones discussed his situation with several colleagues.  Although Professor Jones received some encouragement from his colleagues that he must be misunderstanding the actions of Dean Leonard and Associate Dean Zinnecker and he at one point had contemplated withdrawing the EEOC complaint, Professor Jones still had the reasonable belief that they were targeting him for mistreatment again.  Neither Dean Leonard nor Associate Dean Zinnecker ever retracted Associate Dean Zinnecker's comment that Professor Jones' teaching performance made him "unacceptable" as a tenure candidate.  In addition, Dean Leonard's refusal to communicate with Professor Jones because Professor Jones had filed a

charge of discrimination evinced retaliatory animus on behalf of the Dean, who has broad power to influence a tenure candidate's chance of success.

148.    Finally, Professor Jones recalled Dean Leonard's flagrant, obvious fraud in inducing Professor Jones to take his Oxford leave in the Fall semester rather than in the summer, costing Professor Jones both a fair consideration of his tenure application and approximately $60,000 plus benefits in compensation, while Leonard worked him for free the whole semester.

149.    Professor Lukasik, a new member on the Tenure & Promotion Committee who is a highly regarded scholar, was so certain that there were misunderstandings, and that tenure was all but assured for Professor Jones given his record, that she performed shuttle diplomacy between the deans' suite and Professor Jones and concluded, encouragingly to Professor Jones in his office, "just call [University General Counsel] Bob Cogswell."

150.    Because of Dean Leonard and Associate Dean Zinnecker's discriminatory and retaliatory actions and the resulting uncertainty about the future of his career, Professor Jones began suffering serious stress-related medical problems in late January 2017.  These issues included anxiety, stress, insomnia, and serious skin breakouts.  Professor Jones had never suffered such a condition prior to late January 2017, as copious medical records show.

151.    Because of the hostility of Dean Leonard, Associate Dean Zinnecker, and the University to his tenure application and his complaints of race discrimination, Professor Jones believed that it was necessary to prepare for a career transition from the university.  On February 20, 2017, Professor Jones separately contacted several deans at other law schools inquiring about the possibility of interviewing for a teaching position in fall 2017 or in 2018.  In various letters, Professor Jones stated that he had applied for tenure and was awaiting the University Board of Trustees' decision on his application, noting the previous two unanimous votes on him (the 2011

hiring and the 2015 promotion) and citing Dean Leonard's June 6, 2016, written statement to a third-party banker that "this guy is a rock star on my faculty who will get tenure, so his finances are secure."

152.    On February 20, 2017, Professor Jones also sent a written request to Law deans requesting that they investigate and respond to his complaints about the racially discriminatory student evaluations submitted in the fall 2016 semester. Professor Jones was teaching most of these same students in his spring 2017 courses, and wanted to ensure that racial animus did not negatively affect him or the students in his classes.

153.    On February 21, 2017, Dean Leonard sent Professor Jones a letter stating that Professor Jones's employment at the University would end on May 14, 2017, with the automatic termination of the current-year faculty contract. Dean Leonard's letter falsely asserted that Professor Jones had never applied for tenure because he did not submit any additional updates to his binder of materials before the January 17, 2017, deadline. The letter further stated that Professor Jones was not entitled to a seventh, terminal year at the Law School because he had failed to apply for tenure and that only those whose tenure applications were denied would be entitled to a terminal year of employment. Dean Leonard invoked a strict definition of "up or out" recognized virtually nowhere else in the legal academy, claiming that the policy required Professor Jones' immediate departure in eight weeks. In this written abrogation, Dean Leonard made express reference to Professor Jones's EEOC complaint.

154.    Contrary to the explanation provided by Dean Leonard in his February 21, 2017, letter, the Law School Tenure Policy does not define the updated binder of materials as the tenure "application;" nor does it define "up or out." In fact, Dean Leonard had recognized in his March 6, 2016, email to Professor Jones less than one year earlier that Professor Jones *had*

applied for tenure on September 28, 2015, by submitting a letter expressing his intent to seek

tenure. Dean Leonard further recognized in his November 10, 2016, e-mail to Professor Jones

and his tenure panel that Professor Jones had applied for tenure as of *that* date.

155.    On February 22, 2017, Professor Jones wrote to the members of his tenure panel

to inform them of Dean Leonard's letter and of Professor Jones' belief that he was being

discriminated against because of his race and retaliated against for complaining about race

discrimination. He further asked for the tenure panel's assistance in trying to remedy Dean

Leonard's refusal to review Professor Jones' tenure application, in violation of the terms of

Professor Jones' employment and in usurpation of faculty governance protections set forth in the

Faculty Handbook.

156.    On February 23, 2017, Professor Lisa Lukasik sent Professor Jones an e-mail

reply on behalf of the tenure panel restating Dean Leonard's position that the updated binder of

teaching materials constitutes the "application" for tenure, and that Professor Jones' failure to

submit any updates to his binder prior to the January 17, 2017, deadline meant he had failed to

apply for tenure. The tenure panel instructed Professor Jones to direct all further inquiries to

Dean Leonard, who had previously refused to talk to him directly and had directed that Professor

Jones communicate through the University's counsel.

157.    By email to Professor Lukasik dated February 23, 2017, Professor Jones pointed

out that Dean Leonard had instructed him not to contact him and had ignored a previous message

from him, leaving Professor Jones without an avenue of redress if he were forced to direct all

inquiries to Dean Leonard. In addition, Professor Jones quoted the Accelerated Tenure Process

section of the Law School Tenure Policy, which requires an "application for tenure" to be

submitted by September 15, distinct and apart from the January 15 deadline to submit updates to

the binder of teaching materials. Professor Jones pointed Associate Professor Lukasik to her

own four-month grace period for submission of her materials and to the fact that she was

promoted to Associate Professor without having ever filed an application, along with white

female colleague Sarah Ludington, by the Dean's exercise of discretion to appeal to the

University Trustees to set aside the rules for Tenure & Promotion, back in Fall 2015. Professor

Jones reiterated his request that the tenure panel review his application for tenure, meet with him

to discuss it, and issue a recommendation in accordance with the terms of Professor Jones'

employment.

158.    On February 28, 2017, Professor Jones filed another charge with the EEOC

alleging that the University unlawfully retaliated against him for complaining about race

discrimination, taking the surprise and groundless step of informing him that he would not have

the terminal year and would conclude on May 14, 2017, upon the expiration of the current-year

contract.

159.    At no point prior to February 21 had Campbell through any employee or attorney,

or in any other way, asserted its strange redefinition of "application" or its intended abrogation of

the terminal year in violation of the Tenure Policy, despite Professor Jones or his counsel's

repeated objection to Cogswell's repeated settlement counteroffer of "one year of pay;" Jones

and his counsel repeatedly advised Campbell that such a deal, particularly without the granting

of tenure, was a non-starter on the grounds that Professor Jones was wronged twice and that

Professor Jones was entitled to and would return for the terminal year, under the Tenure Policy

already, invalidating that settlement position as unappealing, if not a threat. Professor Jones

continued to wonder why Cogswell's first response to the EEOC charge was to refuse to speak

with Professor Jones (an employee in good standing) and to try to coerce him into resigning on

Valentine's Day. Because of the fraud, false pretenses, and retaliatory intent perpetrated through those letters from Cogswell and Farr, Professor Jones warned in his next EEOC charge that those materials – ordinarily excluded from evidence under Rule 408 of the Federal Rules of Evidence – were now admissible to prove the new Title VII violations carried out by Bob Cogswell as per *Carney* and similar cases.

160.    On March 1, 2017, *Diverse: Issues in Higher Education*, an online and print-subscription publication about colleges and universities based in Fairfax, Virginia, reported an article about Professor Jones' complaints of discrimination and retaliation against Campbell. This article was picked up on the popular blog of Pepperdine University Law School's newly named Dean Paul Caron and was extrapolated on *Above the Law*, an online legal tabloid.

161.    On March 2, 2017, President Creed wrote an email to all Law School faculty, staff, and students – a group of not fewer than 10,000 people – stating that Professor Jones has filed an EEOC claim against the University. President Creed went on to deny the validity of Professor Jones' allegations. He took sides with Leonard, as well.

162.    On March 9, 2017, Dean Leonard followed suit. He sent a memorandum to all Law School faculty, staff, and students, stating that "the University and the law school categorically deny that Professor Jones has been the subject of any act of discrimination or retaliation." He stated: "We are surprised and disappointed by these allegations."

163.    On March 10, 2017, Professor Jones sent a letter to President Creed expressing his concern that President Creed's March 2, 2017 email to all Law School faculty, staff, and students prejudiced any chance Professor Jones had of successfully pursuing any internal remedies of the Law School's failure to review his tenure application. Under the subject line "Formal protest of e-mail announcement of Thursday March 2, 2017, constituting irreparable

interference with internal avenues of recourse," Professor Jones noted that President Creed's e-mail, which itself broke University policies quoted by Leonard in the news media against commenting on personnel and litigation, would dissuade Professor Jones' colleagues from supporting his application for tenure or participating in his complaints of discrimination. Professor Jones further noted that such an e-mail blast, dissuading reasonable individuals from making or supporting a charge of discrimination, violated federal civil rights statutes and recent Supreme Court precedent banning retaliation against employees who complain of race discrimination.

164.    President Creed, who is white, did not respond to this e-mail or take any form of corrective action at all. He evidenced clear intention to inform all Campbell employees that Campbell University will not abide by the Civil Rights Act of 1964 and will do whatever possible to interfere with the federal statute's real-time application to the university that, in his lifetime as a Southern Baptist, barred all blacks from attending or teaching at Campbell because they were black as a matter of university policy.

165.    On March 13, 2017, the tenured faculty were scheduled to meet to vote on pending tenure applications. Having received no notice or official announcement on the actions of the tenured faculty as was customary and having been unfairly directed to Dean Leonard by Professor Lukasik when she was unable to justify why she and Ludington had been given promotions based on late applications according to her own previously held definitions of "application," Professor Jones on March 14, 2017, e-mailed his tenured mentor, Professor Susan Thrower, asking for a meeting to discuss what actions the tenured faculty took on his application. She had invited this contact expressly via e-mail four months earlier.

166.    On Nov. 9, 2016, initiating the only other e-mail exchange between the unfamiliar-to-each-other Jones and Thrower, Professor Thrower had invited such contact by assuring Professor Jones: "I'm sorry that we haven't had any interactions this semester, as I'm one of your 'mentors' and we haven't even met. ....[I]f you can think of anything at all I can do for you on the T&P [Tenure and Promotion] front, I hope you'll let me know."

167.    Professor Thrower did absolutely nothing to advance Professor Jones's position, and she provided no mentorship of any kind at any point during her tenure at Campbell, despite her job description and Dean Leonard's Spring 2016 notice to Professor Jones that he relied on faculty mentors to work with their tenure candidates toward advancement.

168.    On March 14, 2017, Professor Thrower replied to Professor Jones's question, simply redirecting Professor Jones to Dean Leonard even though the terms of the Tenure Policy expressly obligated her to advise and counsel Professor Jones throughout the Tenure and Promotion process.  Having heard nothing from anybody by March 22, 2017, Professor Jones e-mailed her back, this time copying Professor Kevin Lee, an Asian-American and the only tenured minority (and who used to be Professor Jones' faculty mentor), to ask what happened at the meeting.  Professor Jones also noted here that he believed he had been discriminated and retaliated against in violation of federal civil rights law he quoted, and that members of Law School faculty should not participate in further violations of his rights.  Professor Thrower never replied to Professor Jones' e-mail message even though, as his mentor and superior, she should have engaged in assisting Professor Jones in pursuing these charges internally.

169.    On March 23, 2017, Professor Lee replied to Professor Jones.  Professor Lee stated that Professor Jones was not mentioned at the tenured faculty meeting.  However, the tenured faculty voted at the annual meeting to recommend two lesser-qualified white candidates

for tenure, Professors Weeks and Chriscoe, alumni of Campbell Law School whose publication

and presentation records were comparatively non-existent relative to Professor Jones's over the

years. Chriscoe and Weeks are elderly white alumni of Campbell Law School.

170. On March 28, 2017, while on travel to Washington & Lee University Law School

where he continued his global influence in the legal academy, Professor Jones took time out to

file an appeal to the University challenging Campbell's decision not to shepherd his application

(on the part of Panelists Lukasik, Loftis, and Woodruff with Mentor Thrower) throughout the

Spring 2017 semester, not to vote on his tenure application on March 13 (on the part of the

tenured faculty), and to terminate his employment on May 14, 2017 (on the part of Dean

Leonard, President Creed, and Cogswell). In so doing, Professor Jones followed the avenue of

recourse set forth in Dean Leonard's February 21, 2017, Contract Letter, which had noted that

Professor Jones could file a formal written "contractual issues" appeal to the Appeals Committee

of the University's Deans' Council, which is tasked with processing these appellate hearings.

171. Professor Jones delivered a fully documented indictment, as the opening of the

six-page appeal letter demonstrates:

Dear Chairman Wakefield:

Pursuant to Term 3 of the "Appeal Procedure for Faculty: Contractual Issues," published on Page 52 of
the Campbell University Faculty Handbook – 2017, this letter presents my appeal of the recent decision
of the Tenured Faculty of the Law School to deny my application for tenure for the second year in a
row, effecting recommendations to the Dean that validated the willful contractual and policy violations
of the Norman Adrian Wiggins School of Law's Tenure Policy. Exhibit 1 attached hereto contains
documentary evidence of this collective breach. Exhibit 15, written in March 2016 by the current Chair
of the Law School's Tenure and Promotion Committee, Professor William Woodruff, establishes the
background embodying a continuing "Royal Screw Up" by the School, whereby I alone pay the price
for incompetency and inaction from above while other professors are being elevated and/or retained on
faculty while failing year after year to meet the minimum performance standards. *See also* Ex. 17.

This appeal is timely filed, well within ten calendar days of my "receipt of the decision which is being
appealed" under Appeal Procedure Term 3, Campbell University Faculty Handbook – 2017, Page 52:
Notice to me of the decision to void my Tenure Application was tendered by my 2015-16 Tenured
Faculty Mentor, Associate Professor of Law Kevin Lee, on March 23, 2017. Ex. 1, Part I. Current
Mentor Susan Thrower, in communication with Dean J. Rich Leonard had attempted to conceal the
recent actions of the Faculty by refusing to answer my repeated written inquiries over the week about
the Tenured Faculty's actions. *See* Ex. 1, Part II. Nevertheless, the Appeal is timely and ripened by the

Tenured Faculty's refusal to consider my candidacy for Tenure and failure to even mention my name during their Annual Meeting, while advancing two colleagues' cases.

The seventeen (17) Exhibits attached hereto, taken together, establish documentary context evidencing plain violations of the contracts between me and Campbell University, contracts between Campbell and my colleagues, and the policies binding us. They document my detrimental reliance, Ex. 7; Ex 16, on the written assurances of both former Law School Dean Melissa Essary and current Law School Dean J. Rich Leonard that the faculty this year would vote to tenure me, Ex. 12; ex. 8a. Implied in the written notice of Professor Lee at Exhibit 1 is the circumstance that both of these tenured executives reneged on their commitments and declined to fulfill their contractual, ethical, and moral duties to call a vote on my application in that meeting, while the tenured faculty in the same meeting quickly advanced two other candidates, Ex. 1, Part I, who appear to have fallen far short of the minimum publication standards set forth in the Tenure Policy despite serving a combined total of nearly 45 years on or affiliated with this faculty, *see* Ex. 13.

The documentary records supplied in this Contractual Issues Appeal, along with the corroborating witnesses I intend to call at the hearing, will demonstrate that this case is clear-cut and easily resolved: As I have written and requested repeatedly in the Law School over the last eight weeks, *see, e.g.,* Ex. 1, Part III, I am entitled to all Tenure Panel, Mentoring, and Faculty-Voting processes, including full consideration and a vote as set out in the Tenure Policy, Personnel Manual, and annual contract binding us all. I am entitled to the same treatment by the Tenured Faculty of not fewer than eight previous or current applicants for tenure in the Law School. Pretending that I did not apply and then trying to hide the fact of Tenured Faculty inaction (for a second year in a row) is not acceptable conduct for a law faculty that markets itself as being qualified to mint "practice-ready attorneys" and claims an ethical and moral high ground based in Christian precepts.

Please take note, moreover, that, were there any contractual ambiguity in what the Dean, the Faculty Mentor (Professor Susan Thrower), the Tenure Panel, and ultimately the Tenured Faculty were obligated to be doing in my case, such ambiguities are, as a matter of law, to be construed against the drafter of the contracts/policies. That drafter has always been Campbell University, and not I. In this Appeal, I challenge, for example, Dean Leonard's eleventh-hour attempt to alter the definition of "apply" and "application" retroactively to my detriment. *Compare* Ex. 2-6 to Ex. 8a-8b. I challenge the effect of Dean Leonard's elliptical threat to usurp the power of my Tenure Panel, *cf.* Ex. 8b, in which he sought to cover up the University's breaches against me, with the unfortunate, publicly issued assist days later from the University President, *see* Ex. 14. These actions appear to have coerced the Mentor, the Tenure Panel, and the Tenured Faculty into a serial breach. In this Appeal, I challenge the actions of General Counsel Bob Cogswell, too – for he attempted to have me resign my teaching position by February 14 for no creditable reason, attempting in writing to have me extinguish my federal civil-rights charges and evidencing retaliation in the process. This tactic was designed to complement Leonard's undisclosed re-imagining of the Tenure Policy's definition of "apply," obstructing my entitlement to a Tenured Faculty vote and to deny me at least one more year on faculty at Campbell University, bleaching the faculty and abrogating faculty security in plain violation of the American Bar Association accreditors' biting warning.

University President J. Bradley Creed is identified in the Appeal Procedure as the final arbiter following the hearing: "The decision of the President is final..." Campbell University Faculty Handbook – 2017 at 53. This is a voidable provision in this case, given that Dr. Creed already prejudicially and ill-advisedly biased any internal proceedings when, on March 2, 2017, he issued an e-mail message addressed to approximately 7,000 recipients pledging his support for Dean Leonard against me, naming me, and specifically attempting to discredit the formal civil-rights charges I filed in January and February that reported the University's discriminatory patterns, practices, and decision-making to federal authorities. *See* Ex. 14. **Because of this willfully harmful decree, I (1) request that the University President immediately recuse himself from this appeal proceeding and (2) renew my three-page written request of March 10, 2017, that he retract his global slur, which plainly violated, at my expense, the "UNLAWFUL HARASSMENT POLICY" recorded on Page 54 of Campbell University Faculty Handbook – 2017.**

59

In light of the pressure on previously-innocent faculty members to join in the flouting of University policies and breaches of contracts in order to deny me tenure and a terminal year, *see* Ex. 10 and Ex. 11, I also request that every member of the Deans' Council and the Appeals Committee be advised of their rights and the University's position under *Upjohn Co. v. United States*, 449 U.S. 383 (1981). Applying *Upjohn*, Campbell University's internal and external counsel might have explained to all employees involved in this case that the Campbell lawyer represents the corporation Campbell, and not the individual employee with whom the lawyer is dealing. The highest standards of professionalism call for the University to ensure that my fellow employees understand that the University can waive the attorney-client privilege at any time, and disclose the contents of the conversation between the lawyer and that employee, even if the employee objects. These lawyers represent Campbell, not my co-employees, and conflicts of interest exist. Yet, already since January, numerous colleagues and deans appear to be unaware of a dynamic about which I teach in my ethics classes here: the reality that corporate external counsel often harvest a vested financial advantage by churning cases for years, protracting clients' legal and public exposure to gin up fees for their firms and bonuses for their own pocketbooks while the client suffers unaware of the fiduciary rape, liability increasing by the day as more people participate in the legal wrongs.

To be sure, several Campbell professors appear already to be in jeopardy for what they have done. One lawyer watching this has raised the specter of criminal prosecution: Obedient workers may be intent on following the premature and authority-usurping pronouncements of Dr. Creed and Dean Leonard, *e.g.,* Ex. 8b, but Section 241 of Title 18 of the U.S. Code is the law on point, and its implications are serious.

As the U.S. Department of Justice advises in published guidance at https://www.justice.gov/crt/conspiracy-against-rights, Section 241 is the civil rights conspiracy statute. Under this law, it is unlawful for two or more persons to agree together to injure, threaten, or intimidate a person in any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or the laws of the Unites States, or because of his or her having exercised the same.

[...]

Dean Wakefield, I look forward to the hearing on this timely filed Contractual Issues Appeal arising from Tenured former mentor Kevin Lee's notice of five days ago to me that the Tenured Faculty denied me tenure for a second year in a row (again in violation of contractual obligations, University policy, and traditional collegiality). In this connection, I ask that you convey all correspondence with me via e-mail, in addition to any other means of communication that you prefer.

I will name my Contractual Issues Appeal advocate for the hearing in due course. In the meantime, I thank you for your stewardship

172.   Upon receipt of Professor Jones' Tuesday March 28, 2017, internal appeal copiously and clearly documenting the irregularities on the part of the President, the deans, the Tenure Panel, and Professor Jones' mentor, and with public interest in the continued segregation of its law faculty growing, Campbell desperately began to accelerate its retaliation by manufacturing claims of misconduct against Professor Jones.

173.   On Thursday March 30, 2017, Divinity Dean Andrew Wakefield, the head of the Appeals Committee, denied Professor Jones' appeal out of hand, claiming a lack of jurisdiction

because Professor Jones had allegedly failed to apply for tenure, thus taking the side of Dean Leonard and President Creed against Professor Jones. Professor Jones immediately challenged this improper dismissal of the appeal via e-mail to Wakefield, challenging that determination as a one-man summary hearing disposing of one of the ultimate issues of the appeal in violation of Campbell's own policy for recourse to his committee.

174.    On March 29, 2017, Dean Leonard sent Professor Jones by e-mail an undated letter attachment falsely accusing Professor Jones of creating a "hostile working environment" for his mentor Professor Thrower – who herself turned hostile after failing in her contractual duties to mentor Professor Jones by her own November admission in writing. Leonard claimed that the hostility had come seven days earlier, alleging that Professor Jones committed a violation by writing via e0mail of March 22, 2017, to complain to Thrower of discrimination and retaliation in violation of his civil rights under federal anti-discrimination statutes.

175.    Dean Leonard, who knew or should have known that Thrower's dereliction of support was among the retaliation charges set out in Professor Jones' February 27, 2017, EEOC charge, further stated that the University now had cause to terminate Professor Jones because of "unacceptable threats or acts of intimidation under our University's policy governing Workplace Violence." However, Dean Leonard claimed he was "exercising [his] discretion" to forgo termination and instead issue Professor Jones a "final warning." This was the first and only warning of any kind that Professor Jones had ever received during his 22-year stellar work history across six states, including at Campbell.

176.    The letter caused severe anxiety on the part of Professor Jones, who delayed his exit from Washington & Lee University's law school in order to challenge the lies by reporting the retaliation to the EEOC in a signed statement transmitted from Lexington, Va.

177.    On March 30, 2017, Professor Jones filed an addendum to his retaliation charge

with the EEOC, alleging that the University further retaliated against him for complaining about

race discrimination. In this amended charge, Professor Jones referenced the retaliatory e-mail

messages sent by President Creed and Dean Leonard to all Law School faculty, staff, and

students, and Dean Leonard's unjustified threat of termination.

178.    Then, on the afternoon of Friday March 31, 2017, Robert C. Cogswell, Jr., the

University's General Counsel, sent a letter to Professor Jones' then-attorney accusing Professor

Jones of serious misconduct in a newly manufactured claim. They reverted to a story made up

about Professor Jones's driving, which supposedly had taken place eight days earlier  According

to Cogswell, Professor Thrower and an unnamed by-stander had complained that on March 23,

2017, Professor Jones "recklessly operated" his vehicle in the law school's parking garage by

"driving at an excessive speed towards them in a manner that caused one or both to believe that

Professor Jones was going to hit them with his vehicle."

179.    If Cogswell's vague allegation is taken at face value, it becomes clear that

Professor Jones was being filmed on tape upstairs teaching Contracts II at the very time of this

purported parking-garage episode by which Thrower – herself a known, at-fault person of

interest in the federal investigation – falsely accused Professor Jones of assault.

180.    This Emmett Till, "destroy-the-uppity-black-male" tactic – coming from a white

mentor who had abjectly failed in all of her obligations to her mentee over a period of more than

four months – severely distressed Professor Jones, who has a perfect record of public safety and

who has never assaulted a colleague in his entire life.

181.    On March 31, 2017, Professor Jones' Washington-based physician examined him

and diagnosed him as "suffering from a resurgence of his left side ulnar nerve damage, chronic

62

fatigue and a severe anxiety condition." Dr. Schapiro handed Professor Jones a signed advisory that recommended that Professor Jones "immediately take recovery measures, including referral to orthopedics, continued anti-anxiety prescriptions, and eight weeks off duty."

182.   On April 3, 2017, Professor Jones' then-attorney wrote a letter responding to Mr. Cogswell's March 31, 2017, allegations in which he denied that Professor Jones had driven recklessly in the University parking garage and threatened Professor Thrower or others, and indicated that while Professor Jones had no recollection of such an encounter, Cogswell was free to interview Professor Jones about the purported parking "incident."

183.   Mr. Teague attached for Mr. Cogswell the note from the physician along with earlier notes from the orthopedic surgeon instructing Professor Jones as to care for other symptoms flaring under the distress intentionally inflicted by Campbell since January 9, 2017.

184.   Shortly after receiving the notice from Dr. Schapiro, the University initiated its medical leave process and approved Professor Jones for medical leave through the end of the spring 2017 semester, when his contract expires.

185.   Professor Jones suffered from documented anxiety and insomnia, and was on medication.

186.   To date, Professor Jones has been unable to find comparable employment. Despite submitting approximately 20 applications or inquiry letters to other law schools since Campbell began to retaliate, Professor Jones has not received any job offers or interviews.

187.   He did obtain a temporary position as Interim President and CEO of a small Maryland non-profit retroactive to May 16, 2017, which folded three weeks into his tenure and has ceased operations. He donated $5,000 to the organization to facilitate its smooth folding.

188.   Meanwhile, Professor Jones was forced to attend legal-academy functions with his title of Associate Professor of Law at Campbell University stripped. In July, he presented at Princeton Theological Seminary in New Jersey and at Drexel University's law school in Philadelphia. In August, he presented at the Southeastern Association of Law Schools (SEALS) in Florida. Because of Campbell's abrupt withdrawal of his terminal year and the related elimination of his institutional home, travel resources, and title, Professor Jones appeared with diminished authority at all of the conferences. At the S.E.A.L.S., he had to appear with a private security detail because Campbell Law professors attend this conference and he did not want to encounter any of them due to the pressure that Creed, Cogswell, and Leonard have put on them to frame Professor Jones the way Professor Thrower had tried to do.

189.   Professor Jones was justified in going to the expense of hiring private security. After all, Campbell University had taken to Facebook and Twitter attempting to discredit Professor Jones following his Facebook Live presentation aired on live Christian radio from the campus of Drexel University during the annual Langston Scholars Writing Workshop ("Langston").

190.   Named after America's first black law professor, Langston, held July 6 through July 8 in Philadelphia this year, brings together black-male law professors to develop scholarship and to connect with other similarly situated teachers of law. Professor Jones presented a paper and received feedback but also advised the black-male scholars attending this year of Campbell University's segregated tenured faculty, encouraging them to apply for jobs there in order to change the segregated culture plainly biased against black-male law professors.

191.   On Facebook Live during his regularly scheduled appearance on a 12:30 p.m. weekly radio show based in San Diego, Professor Jones aired live, opening the U.S.P.S.-mailed

version of the March 29 letter from Dean Leonard. On air with a nationally known civil-rights

activist, Jones read from this letter in which Leonard had indicated that complaining to one's

faculty mentor of a federal civil-rights conspiracy violation undertaken by colleagues constituted

cause for immediate termination, to the extent that filing a civil-rights charge at Campbell

University was a violation of the workplace harassment policy. Professor Jones exposed this

serious affront to the equal-employment opportunity laws of the United States issued by a former

federal judge who had earned his law degree from Yale: Dean J. Rich Leonard – all in an effort

to avoid extending the civil rights and contractual remedies owed to Professor Jones.

192.    Campbell then went into a sloppy damage-control mode on July 6, 2017, posting

on its Facebook and Twitter pages a false statement designed to defame Professor Jones:

> "What the record indisputably shows is that in Professor Jones' sixth year at the law school when
> he was required to apply for tenure, he declined to do so. The law school followed all of its
> procedures precisely, appointing a tenure panel to evaluate Professor Jones and informing him of
> the deadline to file his materials. On multiple occasions, he acknowledged these requirements.
> Nonetheless, he submitted nothing, instead creating a completely false controversy that his
> illusory application had been denied."

193.    Campbell thereby invited a barrage of negative public commentary that

compounded the defamatory effect of its false postings.

194.    On July 26, 2017, the Washington-based American Association of University

Professors (AAUP) dispatched a letter to President Creed complaining of Campbell's theft of

Professor Jones's terminal year and demanding a remedy. The AAUP noted:

> The 1940 *Statement of Principles* provides as follows: "Notice should be given at least one year
> prior to the expiration of the probationary period if the teacher is not to be continued in service
> after the expiration of that period." No mention is made here or in any other AAUP document of
> that notice's depending on whether or not the faculty member applies for tenure in the sixth year.

> Since Professor Jones was in his sixth year of probationary service in 2016–17, he therefore
> should have received twelve months of notice of nonreappointment, as stipulated by the 1940
> *Statement of Principles*. Instead, in evident disregard of the policy set forth in that document, he
> received less than three months of notice, making it extremely difficult for him to secure for the
> following academic year another suitable position elsewhere.

195.     On August 1, 2017, Regina W. Calabro, Campbell's new outside counsel in Farr's firm (Ogletree, Deakins, Nash, Smoak, and Stewart, P.C.) replied by letter. She wrote: "Contrary to the allegations made by Mr. Jones, the facts show that he never submitted an application for tenure in 2015, 2016, or 2017. Mr. Jones knows that he never submitted an application."

196.     Campbell through Calabro also portrayed Professor Jones in a false light when she concluded her letter referencing "one of his prior three attorneys," none of whom currently represents Mr. Jones." This false-light portrayal flies in the face of her negotiations with one of the three attorneys as counsel for Professor Jones days after this letter was sent – an attorney who has at all times represented Professor Jones – and another who continues to advise Professor Jones on this matter.

197.     Campbell's false statements of August 1, 2017, defamed Professor Jones to the American Association of University Professors, the Washington-based national advocate for academic freedom and institutional integrity with regard to institutions' hiring and promotion of professors.  On December 2, 2017, Professor Jones was simultaneously approached and invited by an AAUP member serving a large university in North Carolina to create an AAUP chapter at Campbell University.  However, since learning of Professor Jones's non-affiliation with Campbell, the AAUP outreach official has declined to communicate with Professor Jones.

198.     On September 8, 2017, after four weeks of inquiries and responses between himself and Campbell office staff about the only office furnishings left when Professor Jones went on medical leave at the end of March, Professor Jones was left without his $3,000 collection of the 96-volume Wright & Miller federal practice treatise, a gift of sentimental value from Powell Goldstein LLP, which was left in his office along with his ergonomic office chair; Though they claim to have preserved the items, Campbell stopped communicating with

Professor Jones about the transportation of them to him in Washington, D.C., unable to produce any proof of sending and then going silent. Campbell University evidently sold or gave away Professor Jones's possessions despite their obligation to coordinate his out-processing from the faculty as an employee in good standing from March 31, 2017, until his last day: Sunday May 15.

199.    Meanwhile, Professor Jones went onto the annual law-teaching market, having registered for the annual Faculty Recruitment Conference of the Association of American Law Schools in Washington, D.C., the first weekend in November 2017 by transmitting a fully documented faculty recruitment profile over the summer. At the 2009 and 2010 conferences, he had accepted interviews with faculties from a combined total of 52 law schools; this year, however, with no faculty appointment because of Campbell's abrogation of his terminal year and refusal to process his Contractual Issues Appeal, Professor Jones was left with only one interview – from a provisionally accredited law school that to date has not invited him to a campus visit.

200.    Campbell University's two tenure denials and then its abrupt and unprecedented denial of a terminal year or other form of academic appointment, plus its interference with his prospective employment at other law schools, have had disastrous consequences on the academic career of a now-40-year-old academician whom Dean Leonard as late as June 2016 had written was "a rock star on my faculty who will get tenure, so I know his finances are secure."

### COUNT ONE – DISRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981
**Against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower**

201.    Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

202.   Professor Jones and Defendant Campbell entered into an employment agreement on July 1, 2011, which remained in effect until May 14, 2017.

203.   Professor Jones is African-American, and thus a member of a protected category under 42 U.S.C. § 1981.

204.   Defendants Leonard and Campbell discriminated against Professor Jones on the basis of his race by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his fifth academic year, 2015-2016, as required by the terms of Professor Jones' employment.

205.   Defendants Leonard and Campbell further discriminated against Professor Jones on the basis of his race by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his sixth academic year, 2016-2017, as required by the terms of Professor Jones' employment.

206.   Defendants Leonard and Zinnecker further discriminated against Professor Jones on the basis of race by declaring Professor Jones' performance "unacceptable" for a tenure candidate on the basis of explicitly racist student evaluations.

207.   Defendants Leonard and Campbell further discriminated against Professor Jones by refusing to grant him a terminal, seventh year of employment, as required by the terms of Professor Jones' employment.

208.   Defendants Leonard, Cogswell, Thrower, and Campbell further discriminated against Professor Jones on the basis of his race by falsely accusing him of violating the Workplace Violence Policy, invoking racist stereotypes of the violent African-American male.

209.   The explanations provided by Defendants Campbell, Cogswell, Leonard, Thrower, and Zinnecker for the advancement denials detailed in the paragraphs above are

pretextual.  Plaintiff is better qualified than similarly situated white comparators to whom

Campbell granted tenure, and Plaintiff should have been granted tenure based on the

distinguished record he amassed.

210.    Defendants' actions were done in bad faith, with malice, and with willful

disregard for Plaintiff's legal rights.

211.    Defendants' actions directly and proximately caused, and continue to cause,

Professor Jones to suffer financial, reputational, physical, and emotional harm.

## COUNT TWO – RETALIATION IN VIOLATION OF 42 U.S.C. § 1981
### Against Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower

212.    Plaintiff hereby incorporates as though restated each of the allegations set forth in

paragraphs 1 through 200 above.

213.    Professor Jones and Defendant Campbell entered into an employment agreement

on July 1, 2011, which remains in effect until May 14, 2017.

214.    Professor Jones is African-American, and thus a member of a protected category

under 42 U.S.C. § 1981.

215.    Professor Jones engaged in protected activity by submitting complaints about race

discrimination and retaliation internally and to the Equal Employment Opportunity Commission

on January 10, 2017, February 28, 2017, March 30, 2017, and July 11, 2017, and the other dates

cited above.  He also engaged in protected activity by raising concerns internally about race

discrimination at Campbell and by expressly complaining about the University's disparate

treatment of him in the tenure and review process on the basis of his race, as detailed, *supra*.

216.    Defendant Leonard retaliated against Professor Jones for engaging in protected

activity on January 11, 2017, by instructing Professor Jones not to contact him any further.

69

217.    Defendant Cogswell retaliated against Professor Jones by asking him in January 2017 to leave the faculty by February 14, 2017, even though Professor Jones had a perfect record.

218.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on February 21, 2017, by giving Professor Jones notice that his contract would terminate on May 14, 2017, that his tenure application would not be reviewed and voted upon, and that he would not get a seventh, terminal year of employment, as required by the terms of Professor Jones' employment agreement.

219.    Defendants Creed and Campbell retaliated against Professor Jones for engaging in protected activity on March 2, 2017, by issuing a statement to all Law School staff, faculty, and students denying Professor Jones' allegations of race discrimination and retaliation, thus deterring Professor Jones and his colleagues from submitting or supporting further complaints of discrimination.

220.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on March 9, 2017, by issuing a statement to all Law School staff, faculty, and students denying Professor Jones' allegations of race discrimination and retaliation, thus deterring Professor Jones and his colleagues from submitting or supporting further complaints of discrimination.

221.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on March 13, 2017, by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his sixth academic year, 2016-2017, as required by the terms of Professor Jones' employment.

222.    Defendants Campbell, Leonard, and Cogswell retaliated against Professor Jones by rejecting his March 28, 2017, internal contractual appeals package he filed following university policy and Leonard's February 21 contract letter.

223.    Defendants Leonard, Thrower, and Campbell retaliated against Professor Jones for engaging in protected activity on March 29, 2017, by falsely accusing Professor Jones of violating the Workplace Violence Policy for complaining about race discrimination to Professor Thrower.

224.    Defendants Campbell and Thrower retaliated against Professor Jones for engaging in protected activity on March 31, 2017, by falsely accusing him of violating the Workplace Violence Policy for allegedly threatening colleagues with his vehicle, invoking racist stereotypes of the violent African-American male.

225.    The explanations provided by Defendants for the adverse actions taken against him, detailed above are pretextual. Plaintiff is better qualified than similarly situated white comparators to whom Campbell granted tenure, and Plaintiff should have been granted tenure based on the distinguished record he amassed.

226.    Defendants' actions were done in bad faith, with malice, and with willful disregard for Plaintiff's legal rights.

227.    Defendants' actions directly and proximately caused, and continue to cause, Professor Jones to suffer financial, reputational, physical, and emotional harm.

228.    Defendant Cogswell committed retaliation when he advised Professor Jones's supervisor Dean Leonard to bar Professor Jones from communicating with Leonard as of January 11, 2017, because Professor Jones had lodged discrimination complaints.

229.     Defendant Cogswell retaliated against Professor Jones by reappearing, while the subject of a federal discrimination investigation in the February 27 EEOC retaliation charge, on March 31, 2017, to raise the false accusations of Susan Thrower over parking.

230.     Defendant Campbell committed retaliation when it interfered with Professor Jones's approaches to other law schools seeking employment from February 2017 onward.

## COUNT THREE – DISRIMINATION IN VIOLATION OF 42 U.S.C.§ 2000
### Against Defendant Campbell

231.     Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

232.     Professor Jones and Defendant Campbell entered into an employment agreement on July 1, 2011, which remained in effect until May 14, 2017.

233.     Professor Jones is African-American, and thus a member of a protected category under 42 U.S.C. § 2000.

234.     Defendant Campbell is a large employer and thus is legally required to abide by the statutory provisions set forth in Title VII.

235.     Defendant Campbell discriminated against Professor Jones on the basis of his race by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his fifth academic year, 2015-2016, as required by the terms of Professor Jones' employment.

236.     Defendant Campbell further discriminated against Professor Jones on the basis of his race by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his sixth academic year, 2016-2017, as required by the terms of Professor Jones' employment.

237.    Defendant Campbell further discriminated against Professor Jones on the basis of his race by refusing to submit his application to the Board of Trustees for approval or to otherwise approve his tenure application in 2016-17.

238.    Defendant Campbell further discriminated against Professor Jones on the basis of race by declaring Professor Jones' performance "unacceptable" for a tenure candidate on the basis of explicitly racist student evaluations in January 2017.

239.    Defendant Campbell further discriminated against Professor Jones by refusing to grant him a terminal, seventh year of employment, as required by the terms of Professor Jones' employment.

240.    Defendant Campbell further discriminated against Professor Jones by interfering with the federal civil-rights investigation by tampering with witnesses and issuing public statements disavowing the filing of federal employment-discrimination charges.

241.    Defendant Campbell further discriminated against Professor Jones on the basis of his race by falsely accusing him of violating the Workplace Violence Policy, invoking racist stereotypes of the violent African-American male.

242.    The explanations provided by Defendant Campbell for the advancement denials detailed in the paragraphs above are pretextual.  Plaintiff is better qualified than similarly situated white comparators to whom Campbell granted tenure, and Plaintiff should have been granted tenure based on the distinguished record he amassed.

243.    Defendants' actions were done in bad faith, with malice, and with willful disregard for Plaintiff's legal rights.

244.    Defendants' actions directly and proximately caused, and continue to cause, Professor Jones to suffer financial, reputational, physical, and emotional harm.

73

## COUNT FOUR – RETALIATION IN VIOLATION OF 42 U.S.C.§ 2000
### Against Defendant Campbell

245.    Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

246.    Professor Jones and Defendant Campbell entered into an employment agreement on July 1, 2011, which remains in effect until May 14, 2017.

247.    Professor Jones is African-American, and thus a member of a protected category under 42 U.S.C. § 1981.

248.    Defendant Campbell is a large employer and thus is legally required to abide by the statutory provisions set forth in Title VII.

249.    Professor Jones engaged in protected activity by submitting complaints about race discrimination and retaliation internally and to the Equal Employment Opportunity Commission on January 10, 2017, February 28, 2017, March 30, 2017, and July 11, 2017, and the other dates cited above. He also engaged in protected activity by raising concerns internally about race discrimination at Campbell and by expressly complaining about the University's disparate treatment of him in the tenure and review process on the basis of his race, as detailed, *supra*.

250.    Defendant Leonard retaliated against Professor Jones for engaging in protected activity on January 11, 2017, by instructing Professor Jones not to contact him any further.

251.    Defendant Cogswell retaliated against Professor Jones by asking him in January 2017 to leave the faculty by February 14, 2017, even though Professor Jones had a perfect record.

252.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on February 21, 2017, by giving Professor Jones notice that his contract

74

would terminate on May 14, 2017, that his tenure application would not be reviewed and voted upon, and that he would not get a seventh, terminal year of employment, as required by the terms of Professor Jones' employment agreement.

253.    Defendants Creed and Campbell retaliated against Professor Jones for engaging in protected activity on March 2, 2017, by issuing a statement to all Law School staff, faculty, and students denying Professor Jones' allegations of race discrimination and retaliation, thus deterring Professor Jones and his colleagues from submitting or supporting further complaints of discrimination.

254.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on March 9, 2017, by issuing a statement to all Law School staff, faculty, and students denying Professor Jones' allegations of race discrimination and retaliation, thus deterring Professor Jones and his colleagues from submitting or supporting further complaints of discrimination.

255.    Defendants Leonard and Campbell retaliated against Professor Jones for engaging in protected activity on March 13, 2017, by refusing to submit his application to the Tenure and Promotion Committee for review and a vote in his sixth academic year, 2016-2017, as required by the terms of Professor Jones' employment.

256.    Defendants Campbell, Leonard, and Cogswell retaliated against Professor Jones by rejecting his March 28, 2017, internal contractual appeals package he filed following university policy and Leonard's February 21 contract letter.

257.    Defendants Leonard, Thrower, and Campbell retaliated against Professor Jones for engaging in protected activity on March 29, 2017, by falsely accusing Professor Jones of

75

violating the Workplace Violence Policy for complaining about race discrimination to Professor

Thrower.

258.    Defendants Campbell and Thrower retaliated against Professor Jones for engaging

in protected activity on March 31, 2017, by falsely accusing him of violating the Workplace

Violence Policy for allegedly threatening colleagues with his vehicle, invoking racist stereotypes

of the violent African-American male.

259.    Defendant retaliated against Professor Jones by not extending to him any form of

faculty appointment – adjunct of otherwise – even though it has done so for every single white

professor who left Campbell for any reason over the six years of Professor Jones's employment,

including whites who left under the cloud of having failed to meet minimum pre-tenure

productivity standards in terms of publications.

260.    The explanations provided by Defendants for the adverse actions taken against

him, detailed above are pretextual.  Plaintiff is better qualified than similarly situated white

comparators to whom Campbell granted tenure, and Plaintiff should have been granted tenure

based on the distinguished record he amassed.

261.    Defendants' actions were done in bad faith, with malice, and with willful

disregard for Plaintiff's legal rights.

262.    Defendants' actions directly and proximately caused, and continue to cause,

Professor Jones to suffer financial, reputational, physical, and emotional harm.

263.    Defendant Campbell committed retaliation when it directed Cogswell to advise

Professor Jones's supervisor Dean Leonard to bar Professor Jones from communicating with

Leonard as of January 11, 2017, because Professor Jones had lodged discrimination complaints.

264.    Defendant Campbell retaliated against Professor Jones by dispatching the embattled Cogswell, while the subject of a federal discrimination investigation in the February 27 EEOC retaliation charge, to raise the false accusations of Susan Thrower over parking on March 31, 2017.

265.    Defendant Campbell committed retaliation when it interfered with Professor Jones's approaches to other law schools seeking employment from February 2017 onward.

## COUNT FIVE – BREACH OF CONTRACT
### Against Defendants Campbell and Thrower

266.    Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

267.    Professor Jones and Defendant Campbell entered into an employment agreement on July 1, 2011, which remains in effect until May 14, 2017.

268.    Defendant Campbell breached that employment agreement by failing to submit Professor Jones' 2015-2016 tenure application to the Tenure and Promotion Committee for a review and vote, as required by the terms of Professor Jones' employment.

269.    Defendant Campbell breached that employment agreement by failing to submit Professor Jones' 2016-2017 tenure application to the Tenure and Promotion Committee for a review and vote, as required by the terms of Professor Jones' employment.

270.    Defendant Campbell breached that employment agreement by failing to offer Professor Jones a seventh year of employment, as required by the terms of Professor Jones' employment.

271.    Defendant Campbell breached that employment agreement by refusing to process Professor Jones's Contractual Issues Appeal of March 28, 2017.

77

272.    Defendant Campbell breached that employment agreement by refusing to abate the workplace hostility Professor Jones notified managers of throughout the Spring 2017 semester.

273.    Defendant Campbell's actions violated the duties of good faith and fair dealing on contractual formation and in contractual performance.

274.    Defendant Campbell's actions directly and proximately caused, and continue to cause, Professor Jones to suffer financial harm.

275.    Likewise, Defendant Thrower had a contract with Campbell University.

276.    Professor Jones was a third-party beneficiary of that employment contract.

277.    Professor Thrower had tenure.

278.    Professor Thrower was directed in her contractual duties to mentor Professor Jones as a tenured professor.

279.    Professor Thrower was obligated in her contract to adhere to the standards of collegiality and law set forth in her contract.

280.    Dean Leonard wrote in 2016 that he expected tenured mentors to advise and support their mentees in the course of the up-for-tenure years.

281.    Thrower by her own written admission failed to fulfill her basic obligations to Professor Jones.

282.    Thrower was unrelenting in her failures, declining to fulfill her duties to assist Professor Jones when he reported their colleagues' civil-rights violations against him to her, in writing.

283.    Thrower refused to supply information about the annual meeting of the tenured faculty on March 13, 2017.

284.    Over the next days, with no defense to her actions, Thrower violated her duties to
Professor Jones and then attempted to cover her tracks by manufacturing a false narrative
accusing Professor Jones of parking his car violently, causing Professor Jones to receive a
warning letter from Dean Leonard for the first time ever in the history of any employment ever
held by Professor Jones in life.

285.    Thrower breached a contract of which Professor Jones was a third-party
beneficiary and also violated the duties of good faith and fair dealing in contractual performance,
causing damages to Professor Jones.

## COUNT SIX – DEFAMATION
### Against Defendants Campbell, Creed, Leonard, and Thrower

286.    Plaintiff hereby incorporates as though restated each of the allegations set forth in
paragraphs 1 through 200 above.

287.    Defendants committed defamation by speaking, writing, and publishing untruths
against Professor Jones that were counter to actualities, including falsely accusing
Professor Jones of having never filed a tenure application even though Leonard,
Woodruff, and Essary all in writing acknowledge that his application not only had been
filed but that it had been mishandled to Professor Jones's detriment.

288.    Creed committed defamation by disseminating a mass e-mail on March 2 falsely
portraying Professor Jones's federal discrimination charge as without merit.

289.    Leonard committed defamation by disseminating a mass e-mail on March 9
falsely portraying Professor Jones's federal discrimination charge as without merit.

290.    Thrower committed defamation by claiming, at some point in March when she
should have been advising Professor Jones on tenure or informing him about the tenured

faculty's advancement of two white professors, that Professor Jones had targeted her violently while parking his car.

291.      Campbell committed defamation on July 6, 2017, by posting on Facebook and Twitter false statements that Professor Jones had made "defamatory and false accusations," that Professor Jones "declined to [apply for tenure]," that Campbell "followed all of its procedures precisely," and that Professor Jones "submitted nothing, instead creating a completely false controversy."

292.      These statements portrayed Professor Jones in a false light and caused him reputational harm at Campbell, in his profession and in his city of residency, Washington, D.C.

293.      These statements caused students to join in Campbell's campaign of targeting the black civil rights complainant, even as Campbell remained under federal investigation by the EEOC. For example, one former student of Professor Jones's from Fall 2016 who had graduated, Joseph Quinn, weighed in under Campbell's defamatory statement to issue a written claim that he had learned nothing in Professor Jones's classes. Quinn then accused Professor Jones of being the "loudest voice" against the recognition of Lambda back on the Diversity committee; in fact, it was students like Quinn who had elected to expend tens of thousands of dollars at University whose official, published policy barred the recognition of groups like Lambda; Professor Jones was obligated to follow the policy as Diversity Committee chair. Clearly, Campbell's published defamation clearly confused large swaths of the public, including this alumnus, inviting commenters to boldly declare statements about Professor Jones unsupported by the facts of the matter.

Campbell has left this Facebook feed up, chilling cooperation in the final days of the federal government's probe.

## COUNT SEVEN– NEGLIGENT SUPERVISION
### Against Defendants Campbell, Creed, Leonard, Cogswell, and Zinnecker

294.     Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

295.     Defendants Campbell, Creed, Leonard, Cogswell, and Zinnecker failed to ensure that the Tenure & Promotion Committee and tenured-faculty mentors advise and guide applicants for tenure in the fifth year of employment on the tenure track.

296.     Defendants Campbell and Leonard failed to clarify the tenure policy even after the 2016 "royal screw-up" documented its ambiguities and other deficiencies.

297.     Defendants Campbell, Creed, Leonard, Cogswell, and Zinnecker failed to ensure that Campbell professors follow protocols for processing informal and formal complaints of race discrimination.

298.     Defendants' failures to supervise employees with care contributed to the "royal screw-up" that precluded Professor Jones's tenure application from advancement and forestalled a meaningful civil-rights investigation that might have corrected the segregated-tenured-faculty situation to which Campbell has re-devoted itself.

## COUNT EIGHT – FRAUD/FALSE PRETENSES
### Against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower

299.     Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

300.     Defendant Leonard encouraged Professor Jones to apply early for tenure. Leonard falsely claimed in January 2015 that Professor Jones would not be disadvantaged by

being off campus in Fall 2015 on leave at Oxford. Defendant Leonard wrote that going to

Oxford would enhance Professor Jones's early application for tenure. Defendant Leonard

presided at the September 2015 meeting where the faculty tabled Professor Jones's

application. Defendant Leonard never volunteered this information to Professor Jones,

nor did he direct any of his staff or colleagues to do so.

301.    Defendant Leonard in Spring 2016, when confronted about the tabling by a

shocked Professor Jones, lied about having received timely notice and application, and

was promptly disproved when Professor Jones produced the written record showing

Leonard was wrong.

302.    Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower

claimed to support Professor Jones's advancement while working against it at every turn.

303.    Defendants' false pretenses dismantled Professor Jones's academic career

trajectory.

## COUNT NINE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower

304.    Plaintiff hereby incorporates as though restated each of the allegations set forth in

paragraphs 1 through 200 above.

305.    Defendant Cogswell made clear in writing in January that, despite Professor

Jones's spotless record, Campbell wanted him to voluntarily leave by February 14, 2014,

for no stated reason.

306.    As Professor Jones refused to leave and reported more discrimination and

retaliation to federal authorities in January and February, Defendants Campbell, Creed,

Leonard, Cogswell, Zinnecker, and Thrower carried out a program of isolation,

marginalization, mocking, public targeting, false charge, and removal designed to distress Professor Jones so that he would leave.

307.    The actions of Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower left Professor Jones with medical disabilities that Campbell's own insurer attributed entirely to the toxic workplace environment.

## COUNT TEN – CONVERSION
### Against Defendant Campbell

308.    Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

309.    Campbell University committed conversion in possessing and then failing to return to Professor Jones his office furnishings as described in Paragraph 198, instead distributing them elsewhere for Campbell's own pecuniary benefit.

## COUNT ELEVEN - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND INVASION OF PRIVACY
### Against Defendant Catholic University of America

310.    Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 200 above.

311.    Defendant Catholic University of America (CUA) accepted Professor Jones's February 20, 2017, formal letter overture in which he (Jones) e-mailed Dean Attridge of the CUA seeking replacement employment opportunities in the coming year. CUA's Dean Attridge wrote back to Professor Jones positively while, upon information and belief, engaging in an unauthorized communication with Defendant Campbell.

312.    Upon information and belief, the CUA without authorization discussed Professor Jones's employment and also transmitted to Defendant Campbell, Professor Jones's February 20, 2017, letter sent to the CUA.

313.      Defendant Campbell later submitted this third-party communication to Defendant

CUA to the EEOC in order to issue a false claim that Professor Jones provided incorrect

information to the CUA.  Professor Jones's avers that his February 20, 2017, letter to the

CUA was completely accurate.

314.      On February 21, 2017, at 4:33 p.m., Dean Attridge of the CUA, copying three of

his deputies, wrote back to Jones indicating there were no employment opportunities for

Jones.  Minutes later, at 4:45 p.m., Dean Leonard sent Professor Jones the

bizarre Contract Letter abruptly terminating Professor Jones's professorship. Dean

Leonard also informed Jones of his last day of employment. This notice of termination

from Leonard was less than the customary three months notice. Jones was also not

invited back in the Fall. White professors on the other hand are routinely invited back to

teach in the Fall.

315.      Defendant CUA's tortious-inference and invasion-of-privacy misconduct in

Washington, D.C., contributed to Campbell's premature abortion of Professor Jones's

employment.  CUA's over reliance on Dean Leonard also cost Jones his professorship at

the CUA. This reckless conduct by Defendant CUA cost Professor Jones economic

opportunity.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

1.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Leonard,

Cogswell, Zinnecker, and Thrower for race discrimination in violation of the Civil Rights Act of

1866 as amended, 42 U.S.C. § 1981 and § 2000.

2.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Creed, and Leonard for retaliation in violation of the Civil Rights Act of 1866 as amended and Civil Rights Act of 1964;

3.      Enter a judgment in Plaintiff's favor and against Defendant Campbell for breach of contract;

4.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower for false pretenses;

5.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Creed, Leonard, Zinnecker, and Cogswell for negligent supervision;

6.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower for fraud;

7.      Enter a judgment in Plaintiff's favor and against Defendants Campbell, Creed, Leonard, Cogswell, Zinnecker, and Thrower for emotional distress;

8.      Enter a judgment in Plaintiff's favor and against Defendant Campbell for conversion.

9.      Enter a judgment in Plaintiff's favor and against Defendant Catholic University of America for tortious interference with contractual relations and invasion of privacy.

10.     Award Plaintiff damages in an amount to be proven at trial for economic losses, damage to professional reputation, pain and suffering/emotional distress, and loss of enjoyment of life that he has experienced as a result of Defendants' unlawful conduct;

11.     Award Plaintiff punitive damages in an amount to be proven at trial;

12.     Award Plaintiff reasonable attorneys' fees, as well as pre-judgment and post-judgment interest, litigation expenses, and costs; and

13.     Grant such other and further relief which the Court may deem appropriate.

## JURY DEMAND

Plaintiff requests a jury trial for all the counts in this case.

Respectfully submitted,

/s/ A.J Dhali
D.C Bar No. 495909
Dhali PLLC
1828 L. Street. NW. Suite 600
Washington D.C. 20036
T: (202) 556-1285
F: (202) 351-0518
E: ajdhali@dhalilaw.com
*Attorney for Plaintiff Amos N. Jones*

Date: Tuesday December 12, 2017



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N.Jones
_____
                                    Plaintiff

                    vs.                                    Case Number _____

Campbell University et al
_____
                                    Defendant

### SUMMONS

To the above named Defendant:    J. Bradley Creed, President. Campbell University

　　　You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

　　　You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC
_____
Name of Plaintiff's Attorney
1828 L. Street. NW. Suite 600
_____
Address Washington D.C 20036

202-556-1285; ajdhali@dhalilaw.com
_____
Telephone

*Clerk of the Court*

By _____
                              Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828　　　Veuillez appeler au (202) 879-4828 pour une traduction　　　Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오　　 የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ

　　IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO. A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

　　If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones
_____
                                                    Plaintiff

                          vs.                                    Case Number _____

Campbell University et al
_____
                                                    Defendant

### SUMMONS

To the above named Defendant:
                    President John Garvey, Catholic University of America

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC
_____          *Clerk of the Court*
Name of Plaintiff's Attorney

1828 L. Street. NW. Suite 600
_____     By _____
Address Washington D.C 20036                              Deputy Clerk

202-556-1285; ajdhali@dhalilaw.com
_____     Date _____
Telephone

如需翻譯,請打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요        የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ።

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones
_____
                                   Plaintiff

                        vs.                                        Case Number  _____

Campbell University et al
_____
                                   Defendant

## SUMMONS
To the above named Defendant:    J. Rich Leonard

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

    A.J Dhali. Dhali PLLC                                    *Clerk of the Court*
_____
Name of Plaintiff's Attorney
    1828 L. Street. NW. Suite 600                    By  _____
_____                              Deputy Clerk
Address Washington D.C 20036

    202-556-1285; ajdhali@dhalilaw.com            Date  _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                        See reverse side for Spanish translation
                        Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones

_____
                            Plaintiff

                vs.                                    Case Number _____

Campbell University et al

_____
                            Defendant

### SUMMONS

To the above named Defendant:      J. Bradley Creed

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC
_____
Name of Plaintiff's Attorney                          *Clerk of the Court*

1828 L. Street. NW. Suite 600
_____      By _____
Address Washington D.C 20036                              Deputy Clerk

202-556-1285; ajdhali@dhalilaw.com
_____      Date _____
Telephone

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화하십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones
_____
                                                    Plaintiff

                    vs.                                      Case Number  _____

Campbell University et al
_____
                                                    Defendant

## SUMMONS

To the above named Defendant:    ROBERT COGSWELL

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC                                    *Clerk of the Court*
_____
Name of Plaintiff's Attorney
1828 L. Street. NW. Suite 600
_____    By _____
Address Washington D.C 20036                              Deputy Clerk

202-556-1285; ajdhali@dhalilaw.com
_____    Date _____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ትርጉም ከፈለጉ አማርኛ ተናጋሪ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones
_____
                                                        Plaintiff

                        vs.                                    Case Number  _____

Campbell University et al
_____
                                                        Defendant

## SUMMONS

To the above named Defendant:
                        SUSAN THROWER

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC
_____                *Clerk of the Court*
Name of Plaintiff's Attorney
1828 L. Street. NW. Suite 600
_____         By _____
Address Washington D.C 20036                                    Deputy Clerk

202-556-1285; ajdhali@dhalilaw.com
_____         Date _____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                                    CASUM.doc



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Amos N. Jones
_____
                                        Plaintiff

                    vs.                                    Case Number _____

Campbell University et al
_____
                                        Defendant

## SUMMONS

To the above named Defendant:      TIMOTHY ZINNECKER

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

A.J Dhali. Dhali PLLC
_____          *Clerk of the Court*
Name of Plaintiff's Attorney

1828 L. Street. NW. Suite 600
                                                By _____
Address Washington D.C 20036                              Deputy Clerk

202-556-1285; ajdhali@dhalilaw.com
                                                Date _____
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH
INFORMATION SHEET

Amos N. Jones

Case Number: _____

vs

Campbell University et al

Date: Tuesday 12th December 2017

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*  Arinderjit (A.J) Dhali | Relationship to Lawsuit |
| Firm Name:  Dhali PLLC | ☒ Attorney for Plaintiff |
| Telephone No.:                Six digit Unified Bar No.: | ☐ Self (Pro Se) |
| 202-556-1285               495909 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☒ 6 Person Jury    ☐ 12 Person Jury

Demand: $_____                           Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:    *(Check One Box Only)*

**A. CONTRACTS**                              **COLLECTION CASES**

☐ 01 Breach of Contract         ☐ 14 Under $25,000 Pltf. Grants Consent    ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty         ☐ 17 OVER $25,000 Pltf. Grants Consent     ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument      ☐ 27 Insurance/Subrogation                 ☐ 26 Insurance/Subrogation
☐ 07 Personal Property               Over $25,000 Pltf. Grants Consent            Over $25,000 Consent Denied
☒ 13 Employment Discrimination  ☐ 07 Insurance/Subrogation                 ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees          Under $25,000 Pltf. Grants Consent           Under $25,000 Consent Denied
                                ☐ 28 Motion to Confirm Arbitration
                                     Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile            ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion            ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy           ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection   ☐ 11 Libel and Slander                  Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference        ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution       ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal            ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                          Not Malpractice)              ☐ 23 Tobacco
                                                                  ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10  Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability

- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

## II.

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

## D.  REAL PROPERTY

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

/s/ A.J Dhali                              12/12-2017

Attorney's Signature                        Date



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

AMOS N. JONES
Vs.                                                     C.A. No.      2017 CA 008331 B
CAMPBELL UNIVERSITY et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge BRIAN F HOLEMAN
Date:   December 19, 2017
Initial Conference: 9:30 am, Friday, March 16, 2018
Location:   Courtroom 214
                   500 Indiana Avenue N.W.
                   WASHINGTON, DC  20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin